### GENETIC SYSTEMS CORPORATION, Plaintiff,

v.

### ABBOTT LABORATORIES, et al., Defendants.

**Civ. A. No. 87–1722.**

United States District Court, District of Columbia.

July 13, 1988.

Ronald A. Stern, Hughes, Hubbard & Reed, Washington, D.C., and Jerome G. Shapiro (pro hac vice, New York Office), for plaintiff.

Thomas W. Queen, Wiley, Rein & Fielding, Washington, D.C., and Mark E. Barmak, Association General Counsel, Litigation, Abbott Park, Ill., for defendant Abbott Laboratories.

John H. Shenefield, Robert S. Schlossberg, Michael S. Kelly, Washington, D.C., for defendant The American Nat. Red Cross.

## MEMORANDUM OPINION

### JOYCE HENS GREEN, District Judge.

This matter now comes before the Court on the motion of defendant The American National Red Cross ("Red Cross") to dismiss or for summary judgment on all four counts of asserted against it in the amended [1] complaint and the motion of defendant Abbott Laboratories ("Abbott") to dismiss or for summary judgment on the fourth,[2] fifth, and sixth claims of the amended complaint. For the reasons set forth below, the motions of the Red Cross and Abbott are granted.

### I. FACTUAL BACKGROUND [3]

The Red Cross, established as a corporation by Congress in 1905, 36 U.S.C. § 1, supplies 55% of the approximately eleven million pints of blood donated annually for transfusions in the United States.[4] The Red Cross has established 56 blood service regions ("Red Cross Regions") to assist in the collection of blood for transfusion.[5] The regions work with the local Red Cross chapters under the direction and supervision of the Red Cross National Headquarters.[6] The chapters and blood service regions are not separate corporations and are not allowed to be constituted as separate legal entities.[7] The Red Cross Regions, like the Red Cross chapters, all operate pursuant to the same license granted to the Red Cross by the Food and Drug Administration.[8] The Red Cross has the authority to dictate the method of operation of each Red Cross Region and the products it may purchase.[9]

Transfusion blood donated to the Red Cross and independent blood centers is screened for transmissible diseases, including hepatitis [10] and the HTLV antibody

1. The Court granted plaintiff's motion for leave to amend the complaint on March 9, 1988, but expressly declined to comment at that time on the sufficiency of plaintiff's new allegations. Order, Mar. 9, 1988, at 4. The Court also advised the parties that it would stay its consideration of defendants' then-pending motions to dismiss several counts of the original complaint (referred to herein as "Defendants' First Motion") until the completion of briefing on defendants' motions to dismiss the counts added by the amended complaint ("Defendants' Second Motion"). *Id.* at 5.

2. Abbott joins in the Red Cross's motion to dismiss or in the alternative for summary judgment on Count IV of the original complaint, which is identical to Count IV of the amended complaint.

3. As defendants have consistently pointed out, much of the factual discussion presented by Genetic Systems in its oppositions to defendants' motions will not be relevant until the merits of this action are tried and the "rule of reason" is applied. Some of those factual allegations are nonetheless presented here to provide context for the discussion that follows.

4. Amended Complaint, ¶ 8; Declaration of Terrance J. Bieker, Vice President, Sales and Marketing, Genetic Systems Corporation ("Bieker Decl."), ¶ 4. The remainder of the blood for transfusion is collected by more than 150 independent blood centers.

5. Declaration of Stephen H. Richards, Secretary and General Counsel of The American National Red Cross ("Richards Decl."), ¶¶ 7–8.

Plaintiff has referred to the Red Cross' Blood Service Regions as "affiliates" and, sometimes, as chapters. Red Cross "chapters" are, however, entities distinct from the Regions, and the Red Cross Regions are not considered "affiliates." Supplemental Declaration of Victor W. Schmitt, Vice President, Medical Operations, The American National Red Cross ("Schmitt Supp.Decl.") ¶ 3. The term "affiliation" is used by the Red Cross in paragraph 4 of its 1987 contract with Abbott to refer to independent non-Red Cross blood centers to which Abbott may agree to extend the contract prices in the event the Red Cross and the independent center enter into a cooperation agreement. *Id.* ¶ 11. As further discussed below, however, no such extension has been made to date nor are any would-be affiliates parties to the Red Cross–Abbott contract. *Id.*

6. Richards Decl. ¶ 8.

7. Richards Decl. ¶ 10.

8. Schmitt Supp.Decl. ¶ 2.

9. *Id.* ¶ 5.

10. Amended Complaint, ¶ 11; Bieker Decl. ¶ 7.

(AIDS).[11] To support its testing program, the Red Cross annually contracts with private suppliers of blood testing equipment. For many years, Abbott has been the exclusive or dominant supplier of equipment used for screening transfusion blood.[12] From 1978 to 1984, when the only virus for which transfusion blood was routinely screened was hepatitis, Abbott supplied equipment for virtually all hepatitis tests [13] and was the exclusive supplier to the Red Cross. In recent years, however, other competing suppliers, including plaintiff Genetic Systems Corporation ("Genetic Systems") [14] and E.I. duPont de Nemours, Inc. ("duPont") have entered the market.[15] The circumstances leading up to the contract that prompted this litigation—an exclusive two-year contract between the Red Cross and Abbott for testing equipment—involve disputed facts that will be outlined here only for contextual purposes.

In February 1986, when Abbott was the exclusive supplier to the Red Cross of hepatitis and AIDS test equipment, the Red Cross Task Force To Evaluate Infectious Disease Test Kits compared the AIDS tests of several different suppliers, including those of Genetic Systems [16] and Abbott.[17] The Task Force called Genetic Systems' AIDS test the "test of choice" and recommended that, upon FDA approval, Genetic Systems "be given the largest market share (not less than 80% of total collections)." [18] The Task Force recommended

against any exclusive arrangement with Abbott, expressed strongly that the "microplate" technology offered by Genetic Systems was superior to the "bead" technology offered by Abbott, and concluded that the Red Cross should encourage development of the former type of test equipment.[19]

In April 1986, an internal Red Cross survey indicated that twenty-two of the Regions (accounting for more than 2.8 million pints) ranked Genetic Systems as their first choice of suppliers, and twenty-nine (accounting for 2.6 million pints) ranked Abbott as their first choice among suppliers of testing equipment.[20]

By the Summer of 1986, the Red Cross had contracted with Abbott, Genetic Systems, and duPont to supply blood screening test equipment for the period July 1, 1986 through June 30, 1987. After discussions with the Red Cross Regions, the Red Cross determined that six of its fifty-six Regions would be supplied test equipment from Genetic Systems.[21] This volume represented 15% of the AIDS tests performed by the Red Cross and was the the first major contract for a Genetic Systems product.[22] The Red Cross contracted with Abbott to supply the remaining approximately 85% of the 21.6 million tests for hepatitis and AIDS for the same 1986–87 contract period.[23]

---

11. *Id.* ¶ 9.

12. Amended Complaint, ¶ 10.

13. The two hepatitis tests are Hepatitis B Surface Antigen ("surface") and Hepatitis B Core Antibody ("anti-core").

14. Genetic Systems is a subsidiary of Bristol–Meyers, Inc. Amended Complaint, ¶ 2.

15. When the complaint was filed, Genetic Systems enjoyed an 8% market share; this has now apparently declined to 5–6%. Amended Complaint, ¶ 27; Bieker Decl. ¶ 19.

16. Genetic Systems' AIDS test received approval from the Food and Drug Administration in February 1986. Bieker Decl., ¶ 9.

17. Amended Complaint, ¶ 12.

18. Declaration of Jay Kelly Wright, counsel for Genetic Systems, ("Wright Decl."), Exh. 8 (ANRC 03283–84).

19. *Id.* at (ANRC 03284–86).

20. *Id.,* Exh. 15 (ANRC 02828).

21. Schmitt Supp.Decl. ¶ 7.

22. Bieker Decl. ¶ 11.

23. Abbott received a contract for 100% of the Red Cross' "surface" hepatitis test (for one year), 100% of the Red Cross' "anti-core" hepatitis test (for two years), and 85% of the AIDS tests (for one year). Declaration of Richard A. Gonzales, Marketing Manager, U.S. Field Operations, Diagnostics Division, Abbott Laboratories ("Gonzales Decl."), ¶ 18; Schmitt Supp.Decl. 6, Exh. 1 (July 1, 1986 contract between the Red Cross and Genetic Systems).

In July 1986, studies presented at the National Institutes of Health Conference on AIDS indicated that the Abbott AIDS test then in use by the Red Cross was less sensitive to detecting contaminated blood than the test of Genetic Systems.[24] That same month, Victor W. Schmitt, Vice President of Medical Operations of the Red Cross, inquired of Genetic Systems how long it would take for it to supply all Red Cross Regions with their requirements for AIDS tests.[25] Genetic Systems advised the Red Cross that it could do so within four weeks.[26] In the meantime, the Red Cross continued to use the Abbott test and Abbott sought FDA approval of a new, "improved" AIDS test.

By November 1986, the Red Cross was aware that the new Abbott test would not be available until December 1986; that availability date was later delayed to January 1987.[27] The Red Cross became frustrated at the regulatory delays, however, and developed various strategies in response to the problem.[28] Initially, the Red Cross adopted a "contingency plan" under which it would become a "co-investigator" with Abbott to facilitate licensure by the Food and Drug Administration.[29] This contingency plan was never put into effect,[30] however, and the Red Cross adopted a second contingency plan to purchase blood test equipment from alternative suppliers.[31] This second plan was also never implemented because Abbott's new test received FDA approval in January 1987.[32]

One month after Abbott received approval for its new test, the Red Cross received proposals from Genetic Systems, Abbott, and duPont to supply the Red Cross' requirements for AIDS and the two hepatitis tests for a multi-year period commencing July 1, 1987.[33]

The record clearly reflects, and defendants do not deny, that a variety of views, some "strongly held and sharply conflicting," [34] emerged within the Red Cross as to the desirability of contracting with the various test equipment suppliers for the next contract period. For example, in March 1987, the Red Cross Task Force found that the test kits of Genetic Systems, DuPont, and Abbott "all appear to perform with comparable sensitivity and specificity at this time" and would be "acceptable" [35] but recommended that Genetic Systems continue to have a "significant part" of the Red Cross' AIDS test business in light of the

---

24. The National Institute of Health "Multicenter AIDS Cohort Study" found that "the Abbott test missed significantly more AIDS–contaminated blood samples in the study than the Genetic Systems test." Bieker Decl. ¶ 10. Abbott disputes the validity of that study, Gonzales Decl. ¶ 32, and claims that the second phase of the study demonstrated that the Abbott test was in fact superior to that of Genetic Systems. Gonzales Decl. ¶¶ 32–33.

25. Bieker Decl. ¶ 11; Supplemental Declaration of Terrance J. Bieker ("Bieker Supp.Decl.") ¶ 3(A).

26. Id.

27. Wright Decl., Exh. 10 (ANRC 02967), Exh. 11 (ANRC 02969).

28. Transcript of Oral Argument, October 5, 1987 ("Tr.") at 4–5; Wright Decl., Exh. 10 (ANRC 02967).

29. Tr. at 5; Wright Decl., Exh. 10 (ANRC 02967).

30. Second Supplemental Declaration of Victor W. Schmitt ("Schmitt Second Supp.Decl.") at ¶ 3.

31. Tr. at 5; Wright Decl., Exh. 11 (ANRC 02969).

32. Red Cross' Reply on First Motion, at 5; Tr. at 5.

33. Bieker Decl. ¶ 12. The Red Cross invited Genetic Systems to bid for both the hepatitis surface and the anti-core tests, but the latter only for the period commencing July 1, 1988 because Abbott already had the contract with the Red Cross to supply the anti-core test until that time. Genetic Systems' bid was also conditioned upon FDA approval of its anti-core test. At the time the proposals were solicited, only Abbott was licensed for all three tests. Declaration of Victor W. Schmitt ("Schmitt Decl.") ¶ 6 (Schmitt notes that all three suppliers sought to be the sole supplier of AIDS tests for the Red Cross).

34. Red Cross' Reply to Defendants' First Motion, at 5.

35. Wright Decl., Exh. 13 (ANRC 02887); *see also* Schmitt Decl. ¶ 8.

dissatisfaction with the Abbott test in 1986.[36] The Task Force concluded that it was important for Genetic Systems to "remain competitive in this field and continue to develop improved microplate reagents and equipment."[37] Several Red Cross administrators expressed strong support for extending a contract to Genetic Systems over Abbott.[38] After considering the relative benefits and costs of the various bids (facts highly disputed in this litigation),[39] the Red Cross determined to award the contract exclusively to Abbott for a two-year period.

On May 5, 1987, the Red Cross informed Genetic Systems that it had decided to enter into an agreement with Abbott effective July 1, 1987 through June 30, 1989 for the supply of all the Red Cross' requirements for the fifty-six Regions for the three blood tests.[40] Under the contract, the Red Cross Regions order directly from Abbott and pay for the tests pursuant to their budgets that have been approved by the Red Cross.[41]

In addition to the test kits,[42] Abbott is to supply the Red Cross Regions with a data management system ("DMS"), which analyzes the data from all the Red Cross' routine tests, "at no charge" during the contract period.[43] After the contract expires, the regions will be required to pay a separate leasing charge for continued use of the DMS in the event that they switch to a supplier other than Abbott.[44] Currently, DMS is not compatible with the test instrumentation of other suppliers, but under the contract, Abbott agrees to make DMS compatible.[45]

In short, Genetic Systems contends that the two-year exclusive contract between Abbott and the Red Cross effectively froze Genetic Systems out of the market for blood test equipment and has jeopardized the company's ability to survive as a competitor. With this sketch of the facts in mind, defendants' arguments that plaintiff has either failed to state or cannot prove the alleged violations of the antitrust laws shall be examined.

**36.** Wright Decl., Exh. 12 (ANRC 02434–35).

**37.** *Id.*

**38.** *See* Wright Decl., Exh. 13 (ANRC 02887) (Memorandum of Dr. S. Gerald Sandler, Associate Vice President, Medical Operations of the Red Cross); *id.*, Exh. 14 (ANRC 03299) (Memorandum of Dr. Frans Peetoom, Director of Blood Services, Red Cross Pacific Northwest Region); *id.*, Exh. 16 (ANRC 02898).

At the same time, the record reflects that Abbott itself appeared to have some doubts about the quality of the new test. *See* Declaration of Dennis G. Terez, counsel for Genetic Systems (March 7, 1988) ("Terez Decl."), Exh. 5 (A01405—Confidential), Exh. 6 (A03192—Confidential), Exh. 7 (A02630—Confidential).

**39.** Schmitt Decl. ¶ 15; *see* Memorandum Opinion, June 29, 1987, at 14–15 & nn. 23–24; *see also* Plaintiff's Opposition to Defendants' First Motion, at 19–20.

**40.** Bieker Decl. ¶ 14.

**41.** Schmitt Supp.Decl. ¶ 10.

**42.** Another part of the contract challenged by Genetic Systems provides that Abbott will reduce the price on its existing contract with the Red Cross that ended June 30, 1988 for the anti-core test. Bieker Decl. ¶ 15(a); Gonzales Decl. ¶ 26.

**43.** Plaintiff contends that the DMS was a "give away" under the contract, but according to the Red Cross and Abbott, the contract did not provide a separate charge for the DMS because that the cost of the DMS was part of the total contract price. Schmitt Decl. ¶ 12. Genetic Systems' proposal was identical in this respect. *Id.* ¶¶ 11–12; Wright Decl., Exh. 2 (ANRC 03025).

The Red Cross estimates the total value of this portion of the contract to be $4.3 million for the two-year period, plus $7 million in labor savings. Wright Decl., Exh. 23 (ANRC 03013).

**44.** *Id.*, Exh. 3 (ANRC 02170). While plaintiff characterizes this charge as a significant "penalty" amounting to as much as $2.8 million per year for all Regions, creating a strong disincentive for the Regions to switch away from Abbott, Second Supplemental Memorandum of Plaintiff, at 7, Bieker Supp.Decl. ¶ 7, Abbott claims that it is merely "reasonable compensation" for Regions' continued use of the DMS system. Abbott's Reply on Defendants' First Motion, at 4. The contract provides that the monthly leasing charge will range from $960 to $2580 per center depending on whether the Region chooses an alternative supplier for only one or all three of the tests. Wright Decl., Exh. 3 (ANRC 02170).

**45.** Wright Decl., Exh. 3 (ANRC 02170); Bieker Supp.Decl. ¶¶ 6, 7; Gonzales Decl. ¶ 24, 27; Schmitt Decl. ¶ 13.

## II. ANALYSIS

### A. Plaintiff's Allegations

In the amended complaint, plaintiffs allege six counts, two against Abbott alone and four against both defendants:

I. Against Abbott for violation of Sherman Act § 2 in that Abbott's conduct constitutes a monopolization and an attempt to monopolize;

II. Against Abbott and the Red Cross for violation of Sherman Act § 1 in that the conduct of Abbott and the Red Cross constitutes a "contract, combination ... or conspiracy in restraint of trade or commerce";

III. Against Abbott and the Red Cross for violation of Clayton Act § 3 in that the conduct of Abbott and the Red Cross constituted an exclusive dealing arrangement the effect of which may be to substantially lessen competition or tend to create a monopoly;

IV. Against Abbott and the Red Cross for *per se* violation of Sherman Act § 1 in that the conduct of Abbott and the Red Cross constitutes a concerted refusal to deal, and an unlawful conspiracy of combination to boycott plaintiff with respect to purchases of transfusion blood screening equipment by Red Cross affiliates, which are capable of choosing independently between Abbott and plaintiff as competing suppliers;

V. Against Abbott and the Red Cross for violation for Sherman Act § 2 in that the conduct of Abbott and the Red Cross constitutes monopolization, conspiracy to monopolize, and an attempt to monopolize; and

VI. Against Abbott for tortious interference with prospective economic advantage and unfair competition in that Abbott engaged intentionally and maliciously to deprive plaintiff of actual and prospective business relationships, advantages, and opportunities.

Plaintiff also now alleges in the amended complaint the existence of two relevant product markets: (1) the market for transfusion blood screening equipment and (2) the "supply of blood for transfusions and the services associated with such supply." [46]

Defendant Red Cross moves to dismiss or in the alternative for summary judgment on all four counts asserted against it (II–IV), and Abbott moves to dismiss or for summary judgment as to only Counts IV, V, and VI of the amended complaint.

### B. Standards of Review

In viewing a motion to dismiss, a complaint should not be dismissed for failure to state a claim unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The factual allegations of the complaint must be presumed true and liberally construed in favor of plaintiff. *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1506 (D.C.Cir.1984), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); 5 C. Wright & A. Miller, *Federal Practice and Procedure: Civil 2d*, § 1357, at 594 (1969). If the court considers matters outside the pleadings in determining the existence of disputed issues of material fact, then a motion to dismiss should be converted into a motion for summary judgment. Fed.R. Civ.P. 12(b).

Summary judgment is appropriate when there is "no genuine issue as to any material fact." Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* 106 S.Ct. at 2513, but at the same time, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*

---

**46.** Amended Complaint, ¶¶ 23–24.

*Corp. v. Catrett*, 477 U.S. 242, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 202 (1986).

When discovery is incomplete, a court should decline to grant summary judgment if the nonmoving party demonstrates that further discovery may reveal additional facts showing disputed issues of material fact for trial. *See* 10A, C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d*, § 2741, at 549 (1983); *Celotex*, 106 S.Ct. at 2554-55; *see also Cowan v. J.C. Penney Co. Inc.*, 790 F.2d 1529, 1532 (11th Cir.1986). In the instant case, discovery has commenced and a substantial number of documents have been produced, but depositions have been stayed pending resolution of the parties' motions to dismiss or for summary judgment.[47] Of course, the incompleteness of discovery is not a consideration where plaintiff's allegations are not adequately pleaded or where only an issue of law is involved. As discussed further below, plaintiff has raised a number of disputed issues, on some of which it claims it needs additional discovery, but has failed to show the necessary materiality of those facts to the issues now before the Court. While such disputes may well be relevant to any future "rule of reason" analysis, that does not preclude dismissal on the counts now at issue.

*C.  Counts II and III:  Violation of Sherman Act § 1—Conspiracy in Restraint of Trade and Violation of Clayton Act § 3—Exclusive Dealing Contract*

In Count II of the amended complaint, Genetic Systems asserts that Abbott and the Red Cross violated Section 1 of the Sherman Act, which prohibits a "contract, combination ... or conspiracy in restraint of trade of commerce." Plaintiff further alleges in Count III that the conduct of

Abbott and the Red Cross constituted an exclusive dealing arrangement in violation of Section 3 of the Clayton Act. The Red Cross, but not Abbott, moves to dismiss or for summary judgment on both counts. The thrust of the Red Cross' motion is that a buyer in an exclusive dealing contract cannot be held liable under Section 3 of the Clayton Act, and that, absent liability under that section, a claim for violation of the Sherman Act Section 1 cannot stand. The Court agrees.

■ Section 3 of the Clayton Act, 15 U.S.C. § 14, provides that:

> It shall be unlawful for any person ... to lease or make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect *of such lease, sale, or contract for sale or* such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Though few courts have ever addressed the issue,[48] plaintiff has not pointed to any case where a court found a purchaser liable for an exclusive dealing contract, and it appears from the plain language of the statute, the relevant legislative history, and the observations of commentators that Section 3 does not impose liability on purchasers for exclusive dealing contracts. *See McGuire v. Columbia Broadcasting System, Inc.*, 399 F.2d 902, 906 (9th Cir.1968) ("Here, [the defendant] is not the seller and consequently no cause of action is created against it"); 2 E. Kintner, *The Legislative History of the Antitrust Laws and Related Statutes*, 1425 (1978) (reprinting 51 Cong.Rec. 9388 (daily ed. May 28, 1914));[49]

---

**47.** Order, April 19, 1988; *see* Plaintiff's Second Supplemental Memorandum at 2 n. 2.

**48.** *See McGuire v. Columbia Broadcasting System, Inc.*, 399 F.2d 902, 906 (9th Cir.1968) ("While no case which holds to this effect has been drawn to our attention, the language of the statute seems plain.").

**49.** Representative Seldomridge commented: "This provision, as I read it, seems to affect the seller of goods and not the purchaser."

Plaintiff's argument that this portion of the legislative history is not relevant because the term "contract for sale" was not then included in the statute is unpersuasive since that term does not alter, but merely broadens, the obvious intent of Section 3, which is directed at the conduct of sellers.

3 J. von Kalinowski, *Antitrust Laws and Trade Regulation,* § 12.02[3] (1988) ("Section 3 itself does not define the words 'any person' except to indicate that he must be a seller or a lessor."); IV E. Kintner, *Federal Antitrust Law,* § 32.10 & n. 89 (1984) ("only sellers and lessors are subject to [Section 3's] prohibitions") (citing *McGuire,* 399 F.2d at 906).[50] This conclusion, drawn from the clear import of the statutory language, is also consistent with the fundamental antitrust concept that the alleged sins of sellers should not be visited on buyers because of the risk of chilling competition. *See Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.,* 833 F.2d 208, 211 (9th Cir.1987); *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1108–09 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

■ In the face of the Red Cross' argument that buyers cannot be liable under Section 3, plaintiff seeks to characterize the Red Cross as more than solely a purchaser. Plaintiff contends that it is entitled to challenge "the totality of the Red Cross' conduct in eliminating the competition of Genetic Systems with full knowledge of the risks inhering in placing the responsibility for blood safety solely in Abbott's hands.

That conduct includes, but is clearly not limited to, the signing of the 1987 contract." [51] For example, Genetic Systems suggests that the Red Cross entered into "active collaboration" with Abbott when the Red Cross adopted (although it never implemented) a plan to become co-investigator with Abbott on its "improved" AIDS test. Plaintiff further contends that the Red Cross "knowingly joined" in the exclusionary contract with Abbott and thus violated the antitrust laws.[52] For the reasons discussed above and further below, this attempt to fit the square conduct of the Red Cross into the round hole of Section 3 cannot succeed. These characterizations of a purchaser's conduct do not change its competitive contracting posture, and plaintiff has cited no case where a purchaser has been considered a proper defendant in an exclusive dealing contract case under Section 3 of the Clayton Act or Section 1 of the Sherman Act.[53]

Accordingly, the Red Cross is entitled to dismissal of Count III based on the Clayton Act, Section 3. This conclusion and the same reasoning also mandates the dismissal of Count II alleged against the Red Cross brought under the broader proscription [54] of Section 1 of the Sherman Act.[55]

**50.** The argument of Genetic Systems that the Red Cross should not be dismissed from this action because it is a properly joined party, Plaintiff's Opposition to the First Motion of the Red Cross, at 27–30, is without merit since joinder rules do not override the substantive requirements of the antitrust laws that form the basis for this Court's jurisdiction over plaintiff's claims. *Carroll v. Brotherhood of R.R. Trainmen,* 417 F.2d 1025, 1027 (1st Cir.1969), *cert. denied,* 397 U.S. 1039, 90 S.Ct. 1359, 25 L.Ed.2d 650 (1970); *Letmate v. Baltimore and Ohio R.R.,* 311 F.Supp. 1059, 1062 (D.Md.1970).

**51.** Plaintiff's Opposition to Defendants' First Motion, at 31.

**52.** *Id.* at 32.

**53.** In response to the Court's request at oral argument that plaintiff cite any cases holding a purchaser liable, plaintiffs pointed to footnote 51 of the Supreme Court opinion in *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Genetic System's Supplemental Memorandum at 1. In a case involving an exclusive dealing contract between a hospital and a firm of anesthesiologists, the Court rejected the plaintiff's contention that

the hospital was engaged in a *per se* illegal tying arrangement but commented in a footnote that, had the plaintiff presented such proof, "the contract" might have been illegal under the Sherman Act, Section 1. The Court's general observation, however, obviously provides no guidance on the issue of purchaser liability since it suggest only that "the contract" might be found violative of the antitrust laws.

**54.** *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 335, 81 S.Ct. 623, 632, 5 L.Ed.2d 580 (1961) (if a requirements contract is not within the broader proscription of Section 3 of the Clayton Act, it is not forbidden by Section 1 of the Sherman Act); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1239 (3d Cir.1975) (exclusive dealing arrangement legal under Clayton Act would "*a fortiori* be lawful under the less restrictive provision of the Sherman Act").

**55.** Plaintiff's arguments based on the plain language of provision are similarly unavailing with respect to Section 1. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637

Here, too, the absence of any cases holding purchasers liable for exclusive dealing contracts under Section 1 confirms the implicit intent of Congress.

### D. Count IV: Per Se Violation of Sherman Act § 1—Concerted Refusal to Deal and Group Boycott

Plaintiff alleges in Count IV a *per se* violation of Section 1 of the Sherman Act in that the conduct of the Abbott and the Red Cross constitutes a concerted refusal to deal or unlawful group boycott by the Red Cross and its "affiliates." Defendants contend that plaintiff has failed to state a claim because no horizontal agreement to restrain trade can be demonstrated. The Court is persuaded that plaintiff's claim fails as a matter of law.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. It is well-settled that Section 1 was intended to prohibit only "unreasonable" restraints of trade. *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 98, 104 S.Ct. 2948, 2958, 82 L.Ed.2d 70 (1984); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Ordinarily, concerted action under Section 1 is analyzed under the "rule of reason," *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), however, the courts have identified certain limited categories of anticompetitive conduct that have such a "pernicious effect on competition and lack any redeeming virtue" as to make them illegal *per se* without a case-by-case evaluation. *Business Electronics Corp. v. Sharp Electronics Corp.*, — U.S. —, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). These include horizontal and vertical price fixing agreements, division of markets between competitors, tying arrangements, and cer-

tain collective refusals to deal or "group boycotts." *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.*, 467 F.2d 178, 186 (5th Cir.1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed. 2d 690 (1973) (citations omitted). These categories are narrow, however, and the conclusive presumption of invalidity imposed by the *per se* rule is not to be lightly indulged. *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1181 (D.C.Cir.1978).

Group boycotts found sufficiently repugnant to justify *per se* treatment can be categorized in three groups: (1) horizontal agreements among traders to exclude direct competitors, *see, e.g., Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); (2) vertical combinations that are "widespread" in nature to exclude competitors of some members of the combination, *see, e.g., Klor's Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and (3) combinations designed to influence trade practices of boycott victims rather than to eliminate them as competitors. *Worthen Bank & Trust Co. v. National BankAmericard, Inc.*, 485 F.2d 119, 124 (8th Cir.1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). Plaintiff in this case asserts that the group boycott was of the second type—a vertical group boycott—consisting of plaintiff's direct competitor Abbott and the purchasers of plaintiff's product, the Red Cross *and* the Red Cross Regions. The caselaw and the facts do not, however, support plaintiff's allegations that the conduct of these entities constitutes a group boycott.

A mere exclusionary agreement between businesses at different levels of competition does not necessarily constitute the type of "vertical" agreement determined to be an illegal *per se* group boycott. A vertical group boycott, in the absence of price fixing (which is not alleged here), is actually somewhat of a misnomer since it is really an "admixture of the horizontal," *Products Liability Insurance Agency, Inc. v.*

(1978) ("One problem presented by the language of § 1 of the Sherman Act is that it cannot mean what it says.").

*Crum & Forster Insurance Co.*, 682 F.2d 660, 663 (7th Cir.1982), that is, plaintiff must still show that *"multiple* manufacturers or *multiple* distributors" were involved in the alleged conspiracy. *Id.* at 663 (emphasis added) (citing *Com–Tel, Inc. v. DuKane Corp.*, 669 F.2d 404, 412–13 (6th Cir.1982)). The only distinction appears to be that some vertically related entity is also involved in the alleged boycott.

■ *Klor's,* relied on heavily by plaintiff, was, in fact, "not a case of a single trader refusing to deal with another nor even of a manufacturer and a dealer agreeing to an exclusive dealership," but rather involved a "wide combination consisting of manufacturers, distributors, and a retailer" that moved the conduct from the "rule of reason" arena to the realm of *per se* invalidity. *Klor's,* 359 U.S. at 212, 79 S.Ct. at 709; *see Products Liability*, 682 F.2d at 665. The lower courts have indeed interpreted *Klor's* to require more than a unilateral agreement, *see, e.g., McQuade,* 467 F.2d at 186–87 (describing the agreement between the manufacturers, the wholesalers, and a retailer in *Klor's* as a "three cornered" agreement), and the Supreme Court recently reaffirmed that *Klor's* involved a *"horizontal combination ... at the manufacturer and wholesaler levels." Business Electronics Corp.*, 108 S.Ct. at 1525 (emphasis added). Thus, in the absence of concerted horizontal action, a group boycott cannot be alleged. *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 590 (8th Cir.1987) ("refusal to deal involving no concerted action between horizontal competitors does not constitute *per se* unlawful group boycott"), *cert. denied,* —— U.S. ——, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988); *Westman Commission Company v. Hobart International, Inc.*, 796 F.2d 1216, 1224 n. 1 (10th Cir.1986) ("For a group boycott to exist, there must be an agreement among conspirators whose market positions are horizontal to each other."); *Kreuzer v. American Academy of Periodontology*, 735 F.2d 1479, 1490–92 (D.C.Cir.1984); *Dunn &*

*Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241, 244–45 (6th Cir.1982); *Products Liability*, 682 F.2d at 665; *Worthen Bank & Trust Co.*, 485 F.2d 119; *McQuade Tours,* 467 F.2d at 187–88, *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973) (no *per se* group boycott where no allegation that defendant airlines conspired with competitors of plaintiff tour operators); *Pro Football,* 593 F.2d 1173, 1179–80 (" 'group boycott' designation ... is properly restricted to concerted attempts by competitors to exclude horizontal competitors; it should not be applied, and has never been applied by the Supreme Court to concerted refusals that are not designed to drive out competitors but to achieve some other goal").

■ In sum, merely alleging a "vertical" group boycott does not relieve plaintiff of its obligation to show a combination or conspiracy by more than one entity at the same level of competition. Thus, here, since plaintiff has not alleged that any of its competitors other than Abbott were involved in the exclusionary contract, plaintiff can only survive the motion to dismiss by alleging that such an agreement was reached at the purchaser level, *i.e.,* by the Red Cross and its Regions. Although plaintiff makes such an allegation in the amended complaint, the Court finds it defective as a matter of law because the Red Cross is legally incapable of conspiring with its Regions in the purchase of blood testing equipment.

Plaintiff's argument that the Red Cross and its Regions are capable of conspiring for purposes of Sherman Act Section 1 [56] is, as the Red Cross has consistently, vigorously, and correctly contended, without merit because the Red Cross and its Regions are clearly considered one entity for antitrust purposes. The Supreme Court made evident in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that a parent corporation is incapable of conspir-

---

**56.** Plaintiff's Memorandum in Support of its Request for a Temporary Restraining Order, at 37 ("In conjunction with and at the behest of Ab-

bott, Red Cross had joined with the Regional Blood Services Centers to boycott Genetic Systems' test kits.").

ing with its wholly-owned subsidiaries within the meaning of Section 1 of the Sherman Act.[57] Concomitantly, unincorporated divisions of a corporation cannot conspire with the corporation itself.[58] *Id.* at 770, 104 S.Ct. at 2741. That "[a]ctions taken by an unincorporated division in concert with the management of its corporation do not, under the cases, constitute a conspiracy" has, in fact, been taken for granted in antitrust law. 2 Von Kalinowski, *Antitrust Laws and Trade Regulation,* § 6.01[2] n. 62 (1988). The cases suggested by plaintiff to the contrary are inapposite. In *Poller v. Columbia Broadcasting System, Inc.,* 284 F.2d 599, 603 (D.C.Cir.1960), *rev'd on other grounds,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed. 2d 458 (1962), the majority of the Court of Appeals held that CBS could not conspire with its unincorporated but autonomous divisions, and the Supreme Court "avoided the question by finding the requisite plurality of action from allegations of a conspiracy between the corporation and an outsider." 2 Von Kalinowski, *supra,* § 6.01[2] n. 62; *see also Rothery Storage & Van Co. v. Atlas Van Lines,* 792 F.2d 210, 214–15 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987) (finding *Copperweld* inapplicable because agents of Atlas were independent and separately incorporated and, alternatively, because Atlas' board of directors consisted of some of its actual or potential competitors); *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 726 F.2d 1381 (9th Cir.), *cert. denied sub nom. National Football League v. Oakland Raiders,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984) (28 separately owned NFL teams not part of common parent corporation held capable of conspiring). While the inquiry as to the corporate status of the Red Cross and its Regions may be factual in nature, *Los Angeles Memorial Coliseum,* 726 F.2d at 1387, under *Copperweld,* the inquiry need only be brief, as the essential fact is undisputed: the Red Cross Regions are not separate corporations.

Plaintiff does not contest that the Red Cross is a corporation and that the Regions are not separately incorporated.[59] Plaintiff argues, nonetheless, that since the Regions exercise autonomy in certain business decisions (*e.g.,* in employment matters),[60] they should be considered separate entities capable of conspiring with the Red Cross. This type of challenge is, however, clearly precluded by *Copperweld*: "At least when the subsidiary is wholly owned, these factors [measuring 'separateness'] are not sufficient to describe a separate economic entity for purposes of the Sherman Act. These factors simply describe the manner in which the parent chooses to structure a subunit of itself." 467 U.S. at 772 n. 18, 104 S.Ct. at 2742 n. 18. Even were such a functional inquiry proper, it would not resuscitate plaintiff's claim in this case since the Red Cross, not its Regions, exercises ultimate contracting authority over contracts to purchase blood test kits.[61] In-

---

**57.** The Court in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 763, 104 S.Ct. 2731, 2737, 81 L.Ed.2d 628 (1984), expressly rejected the line of reasoning that had arisen from the Court's prior "ambiguous" holding in *United States v. Yellow Cab Co.,* 332 U.S. 218, 227–28, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947), that the "corporate interrelationships of the conspirators ... are not determinative of the applicability of the Sherman Act." The *Copperweld* Court expressly held that the affiliation of the defendants in *Yellow Cab* was irrelevant because the original acquisitions of the cab companies by a controlling shareholder "were *themselves* illegal." 467 U.S. at 761, 104 S.Ct. at 2736 (emphasis in original). The Court went on to distinguish other prior decision that "seemed to acquiesce in the intra-enterprise conspiracy doctrine," *id.* at 766, 104 S.Ct. at 2739, and cleared the precedential deck for *confirming a*

bright line test for the conspiratorial ability of corporations.

**58.** The Court also held that officers and employees of the same firm cannot provide "the plurality of actors imperative for a § 1 conspiracy." *Copperweld,* 467 U.S. at 769, 104 S.Ct. at 2741.

**59.** Richard Decl. ¶ 10.

**60.** Wright Decl., Exh. 28 (ANRC 1058). The fundamental corporate operations of the Regions (including budget, licensing, and contracting) are, however, directly controlled by the Red Cross. Richards Decl. ¶¶ 7, 8, 10; Schmitt Supp.Decl. ¶¶ 2, 3, 10.

**61.** Schmitt Supp.Decl. ¶ 5. Plaintiff seeks to dispute this statement by pointing to its 1986 *contract to supply only 6 of the 56 Regions.*

deed, here, plaintiff's complaint stems from the fact that the Red Cross exercised complete control over its Regions in selecting Abbott over Genetic Systems for the two-year contract. Thus, plaintiff cannot sustain its claim that the Red Cross could have conspired with its own Regions in boycotting Genetic Systems.

Implicitly recognizing the necessity to show the horizontal nature of its group boycott allegation, plaintiff argues alternatively that Abbott and the Red Cross are in fact in a horizontal relationship not because they are direct competitors (for clearly they are not), but because the Red Cross at one time adopted a contingency plan to become a co-investigator with Abbott for the purposes of securing the FDA license for Abbott's "improved" AIDS test. This argument, while creative, is unpersuasive. First, plaintiff does not deny that the "contingency plan" was never implemented. Furthermore, by the time Abbott had received FDA approval for its new test, the Red Cross had adopted a "second" contingency plan that called for obtaining AIDS tests from *another supplier* had Abbott's new test not received approval,[62] negating plaintiff's assertion that Red Cross wandered into the suppliers' arena. Even assuming that the Red Cross' co-investigator status would have raised a fact issue as to whether it should be assimilated to the position of a seller and competitor with plaintiff (an illogical conclusion because even as a "co-investigator," the Red Cross would still have been a purchaser in relation to Genetic Systems), that contingency never occurred. The Red Cross was never put in a position horizontal to plaintiff.

Plaintiff suggests as a second theory that a horizontal agreement to boycott can be found between the Red Cross and non-existent, unidentified independent blood centers to which the Red Cross may extend Abbott's pricing should they choose to "affiliate" with the Red Cross under the 1987–89 contract. Again, this argument is unavailing. At most, the agreement provides only that Red Cross may extend Abbott's prices to the affiliated centers; they would not, however, be bound to deal exclusively with Abbott.[63] In addition, the Red Cross has not yet entered into any "letters of cooperation" with any independent centers under the Abbott contract, nor has plaintiff alleged that such agreements are imminent. *Zenith Radio Corp. v. Hazeltime Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).[64] Thus, plaintiff has not shown that the "affiliation" provision of the contract supports its claim of a group boycott.

In conclusion, plaintiff has failed to allege or to support its allegations that the conduct of Abbott, the Red Cross, and the Red Cross Regions constituted a group boycott in *per se* violation of Section 1 of the Sherman Act. Count IV, therefore, must be dismissed in its entirety.

### E. Count V: Violation of Sherman Act § 2—Conspiracy to Monopolize

Plaintiff alleges for the first time in the amended complaint that Abbott and the Red Cross engaged in a monopoly, conspiracy to monopolize, and an attempt to monopolize in violation of Section 2 of the Sherman Act.[65] Plaintiff's theory is that the two defendants participated in a single conspiracy to assist each other in pursuing their monopolization objectives in their respective markets—for Abbott, the blood

---

The contract itself, however, supports defendants' position because it makes clear that Genetic Systems was contracting with "the Red Cross" and not with the Regions.

Schmitt Supp.Decl. ¶ 6, Exh. 1. The Red Cross determined which of the 56 Regions would be supplied the tests from Genetic Systems. *Id.* ¶ 7. That the regions may individually order quantities under the contract, establish their own delivery schedules, and individually pay for their equipment, Bieker Decl. ¶ 11, Schmitt Supp.Decl. ¶ 10, does not transform them into independent contracting entities for antitrust purposes.

**62.** Wright Decl., Exh. 11 (ANRC 02969).

**63.** Tr. at 9, 17; Wright Decl., Exh. 3 ¶ 4.

**64.** Tr. at 8, 17; Schmitt Supp.Decl. ¶ 11.

**65.** Plaintiff makes the identical claim in Count I, but against only Abbott. Essentially, Count V is only a "conspiracy" claim as to both defendants.

test kit market and, for the Red Cross, the transfusion blood supply market.[66] Both defendants argue that such an allegation of interdependent intent to conspire, even assuming plaintiff's allegations are true, is not recognized in antitrust law and move to dismiss.[67] Again, the Court finds itself in agreement with defendants.

■ A plaintiff must demonstrate the existence of four elements to state a claim for conspiracy to monopolize: (1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize a designated segment of commerce. *Association of Retail Travel Agents, Ltd. v. Air Transport Ass'n of America*, 635 F.Supp. 534, 538 (D.D.C. 1986); *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1258 (2d Cir.1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976).

■ As a preliminary matter, the Court finds that Genetic Systems, as neither a competitor nor a purchaser in the *blood supply* market, lacks standing to challenge any alleged antitrust violations of the Red Cross in that market. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545–46, 103 S.Ct. 897, 912, 74 L.Ed.2d 723 (1983), the Supreme Court emphasized that not every person injured by an antitrust violation has standing to bring an action. Noting that the plaintiff in that case was "neither a consumer nor a competitor in the market in which trade was restrained," *id.* at 539, 103 S.Ct. at 909, the Court found that the plaintiff, a union, lacked standing to challenge an agreement reached by members of the defendant organization to not hire union workers. As in the instant case, the Supreme Court concluded in *Associated General Contractors* that:

> the [plaintiff's] allegations of consequential harm resulting from a violation of the antitrust laws, although buttressed by an allegation of intent to harm the [plaintiff], are insufficient as a matter of law. Other relevant factors—the nature of [plaintiff's] injury, the tenuous and speculative nature of the relationship between the alleged antitrust violation and the [plaintiff's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement of the [plaintiff's] antitrust claim.

*Id.* at 545, 103 S.Ct. at 912.[68] *See also Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 543 (9th Cir.1987); *General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir.1987); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985). Similarly, in this case, plaintiff is admittedly not a competitor, nor a consumer, in the blood supply market. Genetic Systems' allegations of harm to it from any monopolization by the Red Cross in the blood supply market are, not surprisingly, vague and speculative;[69]

---

**66.** Amended Complaint, ¶ 23–24.

**67.** Defendants do not move for summary judgment on this Count, but only for dismissal. Red Cross' Reply on Second Motion, at 2; Abbott Reply on Second Motion, at 3.

**68.** The principles enunciated in *Associated General Contractors* have been firmly applied by the Court of Appeals for this Circuit. *See, e.g., Adams v. Pan American World Airways, Inc.*, 828 F.2d 24, 26–31 (D.C.Cir.1987) (rejecting standing argument of suppliers of labor to transatlantic air transportation market), *cert. denied*, —— U.S. ——, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988).

**69.** Amended Complaint, ¶ 8 ("Red Cross has an objective, however, of controlling the total supply of transfusion blood in the United States"). Even the statements of the Red Cross highlighted by plaintiff, however, do not suggest the sinister motive suggested by plaintiff. *See* Wright Decl., Exh. 4 (ANRC 1050) (a purpose of the Red Cross is "[t]o participate in the national effort to develop and maintain an integrated, not-for-profit blood supply system for the United States"), Exh. 5 (ANRC 1060) ("Members of regional blood services management have a responsibility to expand the program whenever a need is evident"), and Exh. 6 (ANRC 1197) ("efforts to achieve and sustain total supply/total service must be reflected in all Red Cross regional planning").

clearly, there are more direct victims of such monopolization should the allegation prove well-founded—for example, the several hundred independent blood centers, which "compete" with the Red Cross. Plaintiff, accordingly, does not have standing to complain about alleged antitrust violations committed by the Red Cross in the blood supply market. At most, plaintiff has standing to complain about the alleged conspiracy by Abbott and the Red Cross to monopolize the market for blood *screening test equipment.* That claim, too, however, suffers from its own fatal defects.

■ The weakness of plaintiff's allegation in Count V is evident from the strained antitrust theory proffered to the Court. Unable to allege or show that the Red Cross had a specific intent to monopolize a market in which it does not participate (the test equipment market), plaintiff suggests that the alleged intent of the Red Cross to monopolize the blood *supply* market can somehow be transferred and combined with Abbott's alleged intent to monopolize the blood *screening equipment* market. That argument is wholly unpersuasive. As defendants contend, Genetic Systems cannot create a whole conspiracy in this case that is greater than the sum of its parts.

The Supreme Court recently confirmed that a plaintiff cannot avoid the pleading requirements of a claim for conspiracy to monopolize by constructing a theory or evidence of conspiracies in related markets. In *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the plaintiff, a domestic producer of televisions, argued that a group of Japanese manufacturers had engaged in several conspiracies, one of which was to monopolize the market in which plaintiff competed. The Court rejected the proposition that evidence of other conspiracies was adequate to support a claim of conspiracy to monopo-

lize the domestic market under Section 2: "The argument is a mistake. However one decides to describe the contours of the asserted conspiracy—whether there is one conspiracy or several—respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief.... That showing depends in turn on proof that petitioners conspired to [harm competition] in the American market, since the other conduct involved in the alleged conspiracy cannot have caused such an injury." *Id.* at 584 n. 7, 106 S.Ct. at 1354 n. 7. Accordingly, Genetic Systems must demonstrate, with respect to the market in which it has standing (the blood screening equipment market) that defendants had the specific intent to cause it antitrust injury and took overt acts in furtherance of that intent. Here, plaintiff has failed to make sufficient factual allegations.

That the Red Cross may desire to exercise monopolistic control over the national blood supply does not support plaintiff's claim that it contracted with Abbott with the specific intention of causing competitive injury to Genetic Systems or the blood screening equipment market. Plaintiff's attempt to bolster its legal arguments with speculative economic theory is unpersuasive.[70] As the Court observed in *Matsushita,* "[e]vidence that petitioners conspired to raise prices in Japan provides little, if any, support for respondents' claims: a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another." *Id.* at 595–96, 106 S.Ct. at 1361.[71] The absence of specific intent allegations renders a conspiracy to monopolize claim legally insufficient. *Association for Intercollegiate Athletics for Women v. NCAA,* 735 F.2d 577, 586 n. 13 (D.C.Cir. 1984); *see also Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1283 (8th Cir.1981) (plaintiff failed to show that defendant's

**70.** *See* Declaration of Terry A. Hausman, Professor of Economics, Massachusetts Institute of Technology.

**71.** The handwritten notes from a meeting between the Red Cross and Abbott stating that the Red Cross considered the contract to "link the most key component of [the Red Cross'] opera-

tions 'public confidence in the safety of the blood supply,' with the fortunes and capabilities of Abbott," Wright Decl., Exh. 1 (ANRC 03296), do not strengthen plaintiff's allegations because, like plaintiff's other "facts," it does not show specific intent to cause antitrust injury.

alleged coconspirator "shared its specific intent to create a monopoly").

Plaintiff responds that it has alleged that defendants had "mutual purposes and intended effects,"[72] including that Genetic Systems be excluded as a competitor of Abbott. Mere use of the word "intent," however, does not constitute a *factual allegation* of specific intent. Plaintiff's claim that "all of the conspiratorial activity alleged in the complaint is related to the injury suffered by Genetic Systems in the market for transfusion blood screening equipment,"[73] reveals the vagueness of plaintiff's theory and does not remedy this legal deficiency. Plaintiff's complaint is not supported by meaningful factual allegations. *Association of Retail Travel Agents,* 635 F.Supp. at 538; *Mizlou Television Network, Inc. v. National Broadcasting Co.,* 603 F.Supp. 677, 684 (D.D.C. 1984). Furthermore, that a purchaser such as the Red Cross would conspire with a supplier such as Abbott to facilitate the supplier's monopolization of the market to allow, for example, the supplier to charge the purchaser "non-competitive, monopoly prices" is sufficiently implausible to limit any inference of an antitrust violation.[74] *Matsushita,* 475 U.S. at 594, 106 S.Ct. at 1360; *see also Car Carriers Inc.,* 745 F.2d at 1110 (in "considering a motion to dismiss the court is not required to don blinders and ignore commercial reality"); *see also Dunn & Mavis,* 691 F.2d at 244–45; *Coastal Transfer,* 833 F.2d at 211 (rejecting plaintiff's claim that defendant purchaser intended to harm competition in seller's market as "illogical"). Since the essential element of intent is lacking, the Court need not address whether plaintiff has sufficiently alleged overt acts by defendants.

In short, plaintiff does not have standing to complain about any attempt by the Red Cross to monopolize the blood supply market. The Red Cross' intent cannot be theoretically transferred from one market to another. As to the test equipment market, plaintiff has failed to allege any specific intent on the part of the Red Cross to assist Abbott's monopolization. Accordingly, Count V must be dismissed.

### F. Count VI: Tortious Interference with Prospective Economic Advantage and Unfair Competition

Plaintiff's last claim is under state law[75] against only Abbott for tortious interference with prospective economic advantage and unfair competition, that is, plaintiff claims that Abbott intentionally and maliciously deprived plaintiff of actual and prospective business relationships, advantages, and opportunities in entering into the contract with the Red Cross. Abbott moves to dismiss (or for summary judgment) on the basis that plaintiff has not adequately pled or supported its allegations.

To establish a claim for tortious interference with prospective economic advantage, a plaintiff ordinarily must plead (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the inter-

---

**72.** Amended Complaint, ¶ 20.

**73.** Plaintiff's Opposition to Defendants' Second Motion, at 16.

**74.** Plaintiff argues at length that Count V involves issues of fact, such as "plausibility," that cannot be properly decided as a motion to dismiss. For the reasons discussed above, however, the Court finds that the motion raises only issues of law and plaintiff's arguments that defendants have presented misleading facts or that further discovery would support its claim are irrelevant

Indeed, plaintiff itself apparently recognized this at the onset of this case when its Vice President for Sales and Marketing, Terrance Bieker, commented that "[w]hile Abbott's actions may offer the Red Cross an apparent temporary economic benefit, in the long run Ab-

bott's actions deprive the Red Cross of the benefits of competitively-determined prices and product quality." Bieker Decl. ¶ 17. The declaration of plaintiff's economist attempts to explain the theoretical rationality that could have motivated the Red Cross, but fails to persuade that such speculation is allowed under the antitrust laws.

**75.** Plaintiff cites the laws of several jurisdictions —the District of Columbia (the headquarters of the Red Cross), Illinois (the headquarters and principal facility of Abbott Laboratories), and Washington State (all of Genetic Systems' facilities)—but has not yet indicated on which State's law it relies. For present purposes, however, any distinctions among these jurisdictions' laws are irrelevant.

ferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage. *See, e.g., Fishman v. Estate of Wirtz*, 807 F.2d 520, 545 (7th Cir.1986); *Richard Short Oil Co., Inc. v. Texaco, Inc.*, 799 F.2d 415, 419 (8th Cir.1986); *Rickards v. Canine Eye Registration Foundation, Inc.*, 704 F.2d 1449, 1456 (9th Cir. 1983), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983); *Belden Corp. v. Internorth, Inc.*, 90 Ill.App.3d 547, 552, 45 Ill.Dec. 765, 768, 413 N.E.2d 98, 101 (1980). "Unfair competition" is essentially an unprivileged interference with prospective advantage. *Business Equipment Center, Ltd. v. De-Jur Amsco Corp.*, 465 F.Supp. 775, 778 (D.D.C.1978); *Belden*, 90 Ill.App. 3d at 552, 45 Ill.Dec. 765, 768–69, 413 N.E. 2d 98, 101–02. "Motive or purpose to disrupt ongoing business relationships is of central concern in a tortious interference case ... and a strong showing of intent is required to establish liability." *Rickards*, 704 F.2d at 1456. A general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability. *Id.* A competitor's conduct must be more egregious, for example, it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement. *Business Equipment Center*, 465 F.Supp. at 788; *PPX Enterprises v. Audio Fidelity Enterprises, Inc.*, 818 F.2d 266, 269 (2d Cir.1987); *Belden*, 90 Ill.App.3d at 553, 45 Ill.Dec. at 770, 413 N.E.2d at 103.

A thorough review of the amended complaint fails to surface any allegations sufficient to support plaintiff's claim for tortious interference with prospective economic advantage. While plaintiff does allege that it had a valid business relationship or expectancy in business with the Red Cross,[76] its allegations that Abbott intentionally interfered, induced, or caused a breach or termination of this relationship or expectancy are too vague to withstand defendants' motions. At most, the amended complaint alleges that the Red Cross solicited proposals from both Abbott and Genetic Systems and that Abbott realized

that an exclusive contract with the Red Cross would substantially exclude Genetic Systems from the market for blood screening equipment.[77] As even the cases relied on by plaintiff make clear, however, such knowledge or such effect alone, without allegations of *intent to interfere* by Abbott, cannot support plaintiff's claim. *See also Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1105 (11th Cir.1983) (competition for business does not constitute tortious interference); *Nifty Foods Corp. v. The Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832, 838 (2d Cir.1980) (no tortious interference where no evidence that sole motive was to inflict injury or of unlawful means used). Plaintiff's antitrust claims do not alone excuse the necessity for plaintiff to fulfill the pleading requirements of this independent state law claim. Count VI must be dismissed.

### III. CONCLUSION

Accordingly, after full consideration of the parties' pleadings and motions, the declarations of record, the exhibits, and for the reasons set forth above, it is hereby

ORDERED that the motion of the Red Cross to dismiss Counts II, III, IV, and V of the amended complaint be and it hereby is granted; it is

FURTHER ORDERED that the motion of Abbott to dismiss Counts IV, V, and VI of the amended complaint be and it hereby is granted; it is

FURTHER ORDERED that the Red Cross is hereby dismissed as a defendant from this action; and it is

FURTHER ORDERED that Genetic Systems and Abbott, by counsel, must attend the status call scheduled for July 15, 1988 at 9:15 a.m., to discuss further proceedings on the remaining Counts I, II, and III of the complaint.

IT IS SO ORDERED.

---

**76.** Amended Complaint, ¶¶ 14–17.

**77.** Amended Complaint, ¶ 20(a).