**GTE NEW MEDIA SERVICES INCORPORATED,**
Plaintiff,

v.

**AMERITECH CORPORATION,**
et al., Defendants.

**No. 97–CV–2314 (RMU).**

United States District Court, District of Columbia.

Sept. 28, 1998.

Thomas Adam Isaacson, Robert F. Ruyak, Alan Mitchell Wiseman, Darren B. Bernhard, Howrey & Simon, Washington, DC, for GTE New Media Services Incorporated, plaintiff.

Andrew J. Morris, Richard Joseph Favretto, Mayer, Brown & Platt, Washington, DC, for Ameritech Corporation, Ameritech Publishing Inc., Ameritech Interactive Media, Inc, and Ameritech Interactive media Services, Inc., defendants.

Richard William Beckler, Stephen M. McNabb, Fulbright & Jaworski, L.L.P, Washington, DC, for BellSouth Corporation, BellSouth Enterprises, Inc., BellSouth Advertising and Publishing Corp., and Intelligent Media Ventures, Inc., defendants.

Robert J. Zastrow, Bell Atlantic Network Services, Inc., Arlington, VA, Richard G. Taranto, Farr & Taranto, Washington, DC, Mark C. Hansen, Neil M. Gorsuch, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, for Bell Atlantic Corporation, and Bell Atlantic Electronic Commerce Services, Inc., defendants.

Paul H. Friedman, Michael Robert Goodstein, Arter & Hadden, L.L.P., Washington, DC, for SBC Communications, Inc., Pacific Telesis Group and Pacific Bell Interactive Media, defendants.

Mark Daniel Cahn, Stephen Adam Weisbrod, Howard M. Shapiro, Wilmer, Cutler & Pickering, Washington, DC, for U.S. West, Inc., U.S. West Media Group, Inc. and West Dex, Inc, defendants.

Glenn B. Manishin, Blumenfeld & Cohen, Washington, DC, for Netscape Communications Corporation, defendant.

Robert Bruce Holcomb, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Washington, DC, Joel Linzner, Townsend & Townsend & Crew, LLP, San Francisco, CA, for Yahoo!, Incorporated, defendant.

### MEMORANDUM OPINION

URBINA, District Judge.

**Denying Defendants' Motions to Dismiss the Complaint for Lack of Personal Jurisdiction and Improper Venue; Denying in Part and Granting in part the Defendants' Motion to Dismiss the Complaint**

## I. Introduction

The plaintiff filed this action under §§ 4, 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking treble damages and injunctive relief for injuries resulting from the defendants' alleged anti-competitive conduct in the Internet Yellow Pages market. Specifically, the plaintiff alleges the defendants illegally combined and conspired to restrain trade and to monopolize the Internet Yellow Pages market by controlling Internet access points through which competing Internet Yellow Pages providers offer their services. The plaintiff in this action is GTE New Media Services Inc. ("GTE").[1] The defendants in this action are the five regional Bell operating companies ("RBOCs"): Ameritech, Bell Atlantic, BellSouth, SBC, and U.S. West and their respective subsidiaries.[2]

This matter comes before the court on the following motions: Defendants BellSouth, SBC, and U.S. West move to dismiss the complaint for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). Defendants BellSouth and SBC additionally move to dismiss the complaint for improper venue pursuant to Fed.R.Civ.P. 12(b)(3).[3] All defendants, except Bell Atlantic, jointly seek to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim because the plaintiff has failed to allege properly federal antitrust violations under §§ 1, 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and District of Columbia unfair competition and tortious interference with an existing contracts and prospective business relationships claims.FN4FN As explained more fully below, upon consideration of the parties' submissions and the relevant law, the court (1) denies Defendants Bell South, SBC, and U.S. West's motions to dismiss for lack of personal jurisdiction and/or improper venue, and (2) denies in part and grants in part the defendants' joint motion to dismiss for failure to state a claim upon which relief can be granted.

## II. Background

### A. The Internet Yellow Pages

In today's rapidly developing age of computer technology, personal computers enable

---

1. GTE, a Delaware corporation with its principal place of business in Texas, owns and operates an interactive, nationwide Internet Yellow Pages service known as SuperPages® ("SuperPages"), which is published electronically on the Internet.

2. Each of the RBOCs provides an Internet Yellow Pages service. Specifically, Ameritech provides the "Ameritech Internet Yellow Pages" service; Bell Atlantic provides the "Big Yellow Internet Yellow Pages" service; BellSouth provides "The Real Yellow Pages" service; SBC provides the "At Hand" service; and U.S. West provides the "US West Dex" service.

In addition, the five RBOCs are comprised of one or more subsidiaries. For the purpose of this decision, the coordinated activities of a parent and its wholly owned subsidiaries are viewed as that of a single enterprise for Sherman Act violations. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) ("[I]n reality a parent and a wholly owned subsidiary always have a 'unit of purpose or a common design.'"). With respect to U.S. West, however, after discovery if one of its subsidiaries is *not* considered a single enterprise with its parent, then the defendant may resurrect its motion that acts of a subsidiary in question are not attributable to its parent.

3. The remaining two defendants, Ameritech and Bell Atlantic, do not contest jurisdiction or venue. Although initially named as defendants in the complaint, Netscape and Yahoo! have been voluntarily dismissed.

users to create an unlimited number of interactive applications. These applications range from simple programs allowing users to view information or images to more complex programs designed to send or receive information. Users of personal computers cannot access the majority of applications without assistance, however, because substantial investments in time and money make. such an option impractical. The Internet provides a powerful alternative and solution to this problem through the creation of a world-wide network of computers that facilitates the exchange of applications. By virtue of interconnecting computers, users are able to access all applications on the network without having to purchase separately each application.

To develop this new technology many efforts were made to organize efficiently these applications on the Internet. First, a uniform protocol called the World Wide Web (the "Web") assigned each application an address by which a user could easily identify it. On the Web, these interactive applications are commonly referred to as "websites."[4] Second, because users cannot know all of the millions of different types of websites and their specific addresses, search engines were created for the purpose of locating desired websites. For the most part, users engage the search engine by entering relevant terms that describe the desired websites. The search engine subsequently retrieves and displays a list of websites containing the relevant terms. From the list the user can directly connect or "hyperlink" to a listed website.[5] The last segment of this emerging technology consists of graphical interfaces ("web browsers"), which allow users to perform numerous operations on the Internet

without typing computer commands. Web browsers, similar to other operating systems such as Windows 95®, permit users to perform tasks by selecting a visually displayed option rather than directly typing out commands to perform the desired tasks.

As with other developing technologies companies have developed ways to profit off the Internet. For most users they become part of the network of computers by paying a monthly fee to an Internet service provider such as America Online®. Other companies have profited off the Internet by targeting different areas. Netscape [6] for instance sells popular versions of web browsers to users directly or through licensing agreements to network providers. Most commonly, companies profit from the Internet by providing specialized interactive services on their websites. One type of specialized service on a website is a search engine service. Normally, such specialized services do not directly generate revenue from the Internet user but rather by selling advertising space on the websites to other businesses.

The controversy in the case before this court involves the activities of companies who provide national Yellow Pages services through their websites on the Internet ("Internet Yellow Pages"). Because Internet Yellow Pages services are accessed electronically through the Internet and not through large printed volumes, an Internet user in any part of the United States can conveniently access information about a business regardless of where the business is located. Internet Yellow Pages services allow users to "hyperlink" directly from a published business listing or advertisement on the Internet Yellow Pages to the business's direct website. At the website, the user may obtain

4. Websites have distinct addresses, commonly referred to as Universal Resource Locator ("URL") addresses.

5. A *hyperlink* is a link that connects one website to a second website on the Internet. By "clicking" on a designated space on the initial website, a subsequent website can be referenced. The designated space can be a picture, highlighted text, or other indication to take a person viewing the initial website to a second website. Hyperlinks are commonly placed on existing websites, thus, allowing Internet users to move from website to website at the click of a button without

having to type in the URL address. *See generally Intermatic Inc. v. Toeppen*, 947 F.Supp. 1227, 1231 (N.D.Ill.1996).

6. Netscape provides the "Netscape Communicator" and "Netscape Navigator" web browsers. Netscape also provides its own websites including "Netscape's Homepage" and "Netscape's Guide" website which provide users a preselected arrangement of links to popular websites. Unless specified otherwise, the term "Netscape" refers to both its web browsers and websites.

additional information or even purchase goods or services directly over the Internet. This type of transaction is commonly referred to as "electronic commerce." Although more expansive than printed Yellow Pages, providers of Internet Yellow Pages similarly earn revenue by selling advertisement space to businesses. Therefore, profitability for Internet Yellow Pages services largely depends on how many Internet users are accessing these website services.

To access an Internet Yellow Pages service on the Internet users are offered a variety of mechanisms. A common mechanism is through predetermined options on web browsers. Web browsers such as Netscape provide a visually displayed toolbar having options that provide a list of links to connect to popular and commonly visited websites such as Internet Yellow Pages websites. Specifically, by accessing the "Yellow Pages" option through Netscape's toolbar, a user is linked or connected to Internet Yellow Pages services designated by Netscape. Another common mechanism is through links on well known and popular websites such as search engine websites. For example, popular search engine websites such as Four11 and WhoWhere similarly have a "Yellow Pages" option to link directly or connect to a group of pre-selected Internet Yellow Pages services. Finally, assuming a user knows the Internet Yellow Pages' specific address, a user may access the website by inputting the website's specific address into a web browser such as Netscape. For example, a user can access GTE's SuperPages website by inputting its unique address "http://superpages.gte.net" into Netscape to access the website.

## B. Alleged Conspiracy

On or about July 1997, GTE alleges the five RBOCs entered into a conspiracy to capture, control, and dominate the Internet Yellow Pages market. Specifically, GTE alleges the five RBOCs held a number meetings in Colorado, Michigan, Georgia, and California to devise the conspiracy. (Compl. ¶ 47.) As a result of these alleged meetings, the five RBOCs agreed to provide jointly a coded Internet Yellow Pages map of the United States (the "MAP"), which allows users to access particular states and businesses within its borders through the designated Internet Yellow Pages service. (*Id.* ¶ 53); *see* Figure 1 below. Each of the five RBOCs allegedly is the exclusive Internet Yellow Pages provider for a particular region and has agreed not to compete with any of the other RBOCs in their designated region. (*Id.* ¶¶ 54, 61.) The regions allocated to each of the RBOCs correspond to the same region where they provide telecommunication services.[7]

7. Under the alleged conspiracy Defendants (1) Ameritech for its "Ameritech Internet Yellow Pages" service is allocated Wisconsin, Michigan, Illinois, Indiana, Ohio, and parts of Hawaii and/or Alaska, (2) U.S. West for its "US West Dex" Internet Yellow Pages service is allocated Washington, Oregon, Idaho, Montana, North Dakota, South Dakota, Minnesota, Iowa, Wyoming, Nebraska, Utah, Arizona, Colorado, New Mexico, and parts of Hawaii and/or Alaska (3) BellSouth for its "The Best Yellow Pages Online" service is allocated Kentucky, Tennessee, North Carolina, South Carolina, Louisiana, Alabama, Georgia, Mississippi, and Florida; (4) SBC for its "At Hand" Internet Yellow Pages service is allocated California, Nevada, Kansas, Missouri, Oklahoma, Arkansas, Texas, and parts of Hawaii and/or Alaska; and (5) BellAtlantic for its "Big Yellow" Internet Yellow Pages service is allocated Connecticut, Maine, Massachusetts, New York, New Jersey, New Hampshire, Rhode Island, Vermont, Pennsylvania, West Virginia, Virginia. Delaware, Maryland, and the District of Columbia. (Compl. ¶¶ 53–55.)

**Yellow Page Search**

**Select By Region: Click on Region**

Figure

1.(Recreated)

Coded MAP

To dominate the Internet Yellow Pages market, GTE alleges the defendant RBOCs planned to obtain exclusive links for their MAP at well known Internet access points. (*Id.* ¶ 54.) To obtain these exclusive links, GTE alleges the defendants formed agreements with Netscape to control how users accessed the Internet Yellow Pages through Netscape's toolbar. (*Id.* ¶¶ 58, 62.) Specifically, when users selected the "Yellow Pages" option on Netscape's toolbar, Netscape would direct the users exclusively to the defendants' MAP. (*Id.*) GTE alleges the defendants also engaged with Yahoo! to control how users accessed the Internet Yellow Pages through a website Yahoo! maintained for Netscape called "Netscape's Guide by Yahoo!." (*Id.* ¶¶ 54, 62.) As stated previously, this website offers users a pre-selected arrangement of hyperlinks to popular websites such as Internet Yellow Pages websites.

GTE alleges Yahoo! similarly directed users exclusively to the defendants' MAP whenever users selected the "Yellow Pages" option on Netscape's Guide toolbar. The five RBOCs have also allegedly reached similar agreements with other co-conspirators not named in the complaint who operate and maintain well known and popular search engine websites such as Four11 and WhoWhere. (*Id.* ¶¶ 68–69.)

Before the alleged conspiracy, GTE contracted with Netscape to direct users to GTE's Internet Yellow Pages service "SuperPages" whenever a user selected the "Yellow Pages" option on Netscape's toolbar.[8] As a result of the alleged conspiracy, GTE asserts that on July 18, 1997, Netscape terminated its links to GTE's SuperPages, including hyperlinks on Netscape's Guide by Yahoo!. (*Id.* ¶¶ 59, 62.) Prior to the alleged conspira-

---

8. Specifically, the contract between GTE and Netscape provided that Netscape would place a link to GTE's SuperPages whenever a user selected the "Yellow Pages" option using Netscape's toolbar. A link was provided on the toolbar of Netscape's web browsers (*i.e.,* "Netscape Communicator" and "Netscape Navigator") and Netscape's websites, which includes "Netscape's Home Page" and "Netscape's Guide." By selecting the "NetSearch" and "Guide to the Internet" toolbar option on Netscape's websites or by

selecting the "NetSearch" and "Destinations" toolbar option on Netscape Navigator or the "Search" and "Guide" toolbar option on Netscape Communicator, a user was provided with the "Yellow Pages" option. (Compl. ¶ 40.) When a user selected the "Yellow Pages" option Netscape provided the user with a list of Internet Yellow Pages providers from which to select from including GTE's SuperPages and other competing Internet Yellow Pages providers. (*Id.*)

cy, GTE alleges Netscape provided users with a selection of competing Internet Yellow Pages providers when accessing the "Yellow Pages" option through its toolbar. (*Id.* ¶¶ 42, 45.) Consequently, GTE filed the above-captioned complaint alleging five counts. In Count I, GTE alleges the defendants combined, conspired, contracted and agreed with each other to restrain trade in the national and regional Internet Yellow Pages markets in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. In Count II, GTE alleges the defendants combined, conspired, contracted and agreed with specific intent to monopolize the Internet Yellow Pages markets in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. In Count III, GTE alleges the defendants entered into contracts in restraint of trade and conspired to monopolize the relevant Internet Yellow Pages markets in violation of D.C.Code 1981 §§ 28–4502, 28–4503. (*See* Compl. ¶ 4.) In Counts IV and V, GTE alleges the defendants' anti-competitive acts with Netscape and Yahoo! violate District of Columbia common law by tortiously interfering with its existing contract with Netscape and prospective business relationships from advertisers who would continue to purchase Internet advertising space on GTE's Super-Pages service.

## III. Discussion

### A. Personal Jurisdiction

■ Three non-resident RBOC defendants (BellSouth, SBC, and U.S. West) move to dismiss the complaint for lack of personal jurisdiction because they have no contacts with this jurisdiction in connection with the disputed matter. In such a challenge, the plaintiff bears the burden of establishing personal jurisdiction over the defendants. *See Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *see also Dooley v. United Technologies Corp.,* 786 F.Supp. 65, 70 (D.D.C.1992) ("[T]he plaintiff has the burden of establishing that jurisdiction exists."). Prior to an evidentiary hearing or discovery, the plaintiff may defeat a motion to dismiss the complaint for lack of personal jurisdiction by making mere factual allegations to establish a prima facie showing of jurisdiction. *See Ball v. Metallurgie Hobo-*

*ken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). In that regard, the plaintiff is entitled to his complaint and any doubts resolved in the light most favorable to him. *See Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990). The plaintiff, however, cannot rest on bare allegations or conclusory statements and must allege specific facts connecting each defendant with the forum. *Schwartz v. CDI Japan, Ltd.,* 938 F.Supp. 1, 4 (D.D.C.1996). In antitrust cases involving multiple defendants, the plaintiff has the burden of establishing personal jurisdiction over each defendant. *See Delong Equipment Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 855 (11th Cir.1988); *see also Schwartz,* 938 F.Supp. at 4 (citing *First Chicago Int'l v. United Exchange Co.,* 836 F.2d 1375, 1378 (D.C.Cir.1988)).

**1. The Court Has Personal Jurisdiction Over the Non–Resident Defendants Pursuant to D.C. Long–Arm Statute Section 13–423(a)(4)**

■ The adequacy of a court's exercise of personal jurisdiction over the three non-resident defendants begins with determining whether jurisdiction is proper under the forum's long-arm statute. The court, therefore, must determine if exercising jurisdiction over these non-resident defendants is proper under the District of Columbia long-arm statute and is consistent with the demands of due process. *United States v. Ferrara,* 54 F.3d 825, 828 (D.C.Cir.1995). For the reasons stated herein, the court concludes that it has personal jurisdiction over Defendants BellSouth, SBC, and U.S. West under § 13–423(a)(4) of the District of Columbia long-arm statute because the acts of the non-resident defendants caused tortious injury in the District of Columbia by an act outside this jurisdiction.

The District of Columbia long-arm statute states in relevant part as follows:

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's ... (4) *causing tortious injury* in the Dis-

trict of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed or services rendered, in the District of Columbia.

D.C.Code § 13–423(a)(4) (emphasis added).

■ To establish personal jurisdiction under this provision, a plaintiff must allege sufficient facts to make out a prima facie showing that (1) the plaintiff suffered a tortious injury in the District of Columbia, (2) the injury was caused by the defendant's act or omission outside of the District of Columbia, and (3) the defendants had one of the three enumerated contacts with the District of Columbia. *See Blumenthal v. Drudge*, 992 F.Supp. 44, 53 (D.D.C.1998). This last inquiry focuses on whether a defendant (i) regularly does or solicits business, (ii) engages in any other persistent course of conduct, or (iii) derives substantial revenue from goods used or consumed or services rendered in this district. *Id.; see also* D.C.Code § 13–423(a)(4). The plaintiff must satisfy all three requirements and also establish that minimum contacts consistent with notions of due process exist before the court can exercise personal jurisdiction over the nonresident defendants. *See* § 13–423(a)(4).

### a. Plaintiff Has Sufficiently Alleged a Tortious Injury in the District of Columbia

GTE claims that District of Columbia users who seek Internet Yellow Pages service through Netscape's toolbar are directed away from its SuperPages service and directed to the defendants' MAP. (Compl.¶ 62.) GTE claims it has consequently suffered tortious injury because of the defendants' alleged exclusionary acts restrict GTE's ability to generate advertising revenue. (*Id.* ¶ 74.) In this respect, GTE's profitability substantially depends on the advertising rates it charges to Internet advertisers, and GTE's advertising rates, in large measure, are determined by the number of users GTE attracts to advertisers' websites. Moreover, it makes no difference that the injury GTE claims to have suffered derived from alleged antitrust violations because an antitrust injury creates a liability in tort. *See Albert Levine Assoc. v. Bertoni & Cotti*, 314 F.Supp. 169, 171 (S.D.N.Y.1970). Thus, because GTE's advertising revenue depends, in large part, on the number of users in the District of Columbia accessing its service, the act of directing users away from GTE's SuperPages service foreseeably causes tortious injury to GTE's business in this forum. (*See id.* ¶¶ 5–6, 74.) Accordingly, the court finds GTE has sufficiently alleged a tortious injury in the District of Columbia.

### b. Defendants' Acts Outside of District Caused the Tortious Injury Inside the District

GTE alleges the defendants have joined in a conspiracy to restrain trade and to monopolize the Internet Yellow Pages market in violation of §§ 1, 2 of the Sherman Act. Specifically, GTE alleges the defendants entered into a conspiracy based on a number of meetings in Colorado, Michigan, Georgia, and California for the purpose of monopolizing the Internet Yellow Pages market. (Compl.¶ 47.) Allegedly, to achieve this goal, defendants formed agreements with Netscape and Yahoo! to prevent users from accessing their competitors' websites through essential Internet access points such as the toolbar on Netscape's web browser and Netscape's Guide by Yahoo!. (*Id.* ¶ 58.) GTE alleges its injuries are, as a result, caused by these unlawful agreements formed outside the district, which preclude users from accessing its SuperPages service. Accordingly, the court finds GTE has sufficiently demonstrated that its injuries directly result from the defendants' alleged unlawful acts, which occurred outside the forum district.

### c. Defendants Satisfy the "Persistent Course of Conduct" Plus Factor Through Their MAP and Internet Yellow Pages Websites

The D.C. Circuit has interpreted D.C.Code § 13–423(a)(4) as requiring "something more" for cases involving a harm-generating act occurring outside the forum, which impacts in the forum and becomes the basis for drawing the case into the court. *Crane v.*

*Carr,* 814 F.2d 758, 763 (D.C.Cir.1987). "The 'something more' or 'plus factor' does not itself supply the basis for the assertion of jurisdiction, but it does serve to filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum." *Id.* at 763.

■ In determining whether the exercise of personal jurisdiction is warranted when jurisdiction is premised on Internet related contacts, many courts focus on the level of interactivity and commercial nature between the defendant's Internet contacts and the forum district. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997) (stating "the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.") (internal citation omitted); *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 418 (9th Cir.1997). Generally courts use a "sliding scale" approach that is "directly proportionate to the nature and quality of the commercial activity that an entity conducts over the Internet." *Id.* If a non-resident defendant conducts a direct commercial transaction with users in the forum district over the Internet, the exercise of personal jurisdiction is usually warranted. *Id.* Additionally, courts agree that when Internet contacts are tenuous, *i.e.,* a "passive" website that simply posts information on an Internet website accessible to all users in foreign jurisdictions, non-Internet related contacts are needed with the forum district to warrant the exercise of personal jurisdiction. *See Blumenthal,* 992 F.Supp. at 55 (summarizing Internet personal jurisdiction cases); *Heroes, Inc. v. Heroes Foundation,* 958 F.Supp. 1 (D.D.C.1996).

This case falls in the "middle ground" where the RBOC defendants' Internet contact is an interactive website seeking information from users which the will later be used for commercial gain. The court concludes that the non-resident RBOC defendants, which own or maintain a website that is both (1) highly interactive with users in the District of Columbia and (2) significantly commercial in "quality" and "nature," warrant the exercise of personal jurisdiction. *See Zippo,* 952 F.Supp. at 1124; *Cybersell,* 130 F.3d at 418.

### (1) The Defendants Maintain an Interactive MAP and Internet Yellow Pages Websites

The defendants' MAP and Internet Yellow Pages websites are highly interactive and accessible to users in this jurisdiction. (Compl.¶¶ 5–6.) Unlike a passive website, which simply allows a user to view information, the defendants' websites actively seek an exchange of information with users. In the present case, the plaintiff alleges the defendants have purposely placed exclusive links to their MAP at well known and popular Internet access points. Once the user is channeled to the defendants' MAP, the user must then determine where (by naming a state) to search for a listed business. The user can either select a state by "clicking" its image on the MAP or by directly inputting the name of the state at the selection prompt. Depending on the state selected, the user is directly linked to the predetermined Internet Yellow Pages provider's website (*e.g.,* a non-resident user selecting the District of Columbia would be linked to Bell Atlantic's "Big Yellow" website service). At the individual Internet Yellow Pages website, a user must provide information to a find a particular business. This again requires the user to input key words or search under a category heading. Finally, once the desired business is found, often times the Internet Yellow Pages service will have a direct hyperlink to the business's website. At the website, a user may even partake in a commercial transaction such as reserving a room at a hotel in a different state. Thus, the court finds the level of participation and involvement required under these circumstances leads to the conclusion that the defendants' MAP and websites are highly interactive.

### (2) The Commercial "Quality" and "Nature" of the Defendants' Interactive Website is Significant

The commercial nature of the defendants' websites is revealed by the advertising revenues the defendants generate when users in the District of Columbia interact with their Internet Yellow Pages websites. Similar to

publishers of the traditional, non-Internet Yellow Pages, the defendants directly earn revenue by selling advertising space to advertisers. Therefore, advertising revenue in the Internet Yellow Pages market substantially depends on the number of users accessing a particular website because Internet advertisers are willing to pay higher advertisement rates on websites with a higher volume of user traffic. Stated differently, the ability of the defendants to generate advertising revenue is dictated by market share and/or volume. By allegedly channeling users in the District of Columbia exclusively to their MAP whenever the Internet Yellow Pages service was sought, the defendants secured advertising revenue by increasing the user traffic on their websites. (*See Compl.* ¶¶ 39, 54–62.)

Thus, while the defendants do not generate revenue through direct commercial transactions with users, they derive profit from their website-related activity that occurs in the District of Columbia. Moreover, for the purposes of personal jurisdiction, the non-resident defendant RBOCs should not be viewed differently than any other non-resident defendants conducting commercial transactions involving consumers residing in the forum district. *See Zippo*, 952 F.Supp. at 1124, 1126; *CompuServe Inc. v. Patterson*, 89 F.3d 1257 (6th Cir.1996); *Digital Equipment Corp. v. Altavista Tech.*, 960 F.Supp. 456 (D.Mass.1997); *Cody v. Ward*, 954 F.Supp. 43 (D.Conn.1997). In either case the non-resident defendant controls the means by which it seeks to economically benefit from the forum district. As such, the commercial "quality" and "nature" of the defendants' alleged exclusionary anti-competitive acts, which secures an economic benefit from users in the District of Columbia interacting with their websites, favors exercising personal jurisdiction over the non-resident defendant RBOCs. Accordingly, the court finds the non-resident defendants gain significant economic benefit from their Internet Yellow Pages websites in the District of Columbia,

thereby satisfying the § 13–423(a)(4) prong of the District of Columbia long-arm statute.[9]

### (3) The Court's Exercise of Personal Jurisdiction Comports with Due Process

To exercise personal jurisdiction over a non-resident defendant consistent with the demands of due process, a court must determine whether the non-resident defendant has "minimum contacts" with the forum district such that exercise of jurisdiction comports with traditional notions of "fair play" and "substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). When dealing with non-resident defendants that own and maintain websites on the Internet, the non-resident defendants must purposefully direct activity through their websites to the forum district such that the non-resident defendants should reasonably anticipate being haled into court there. *Blumenthal*, 992 F.Supp. 44, 57–58. Here, the continuous contact the defendants' interactive websites have with the District of Columbia demonstrate the defendants purposefully established minimum contacts by invoking the benefits and privileges of conducting activities in the forum district. *See Asahi Metal Ind. v. Superior Court of California*, 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1988). Moreover, the commercial "quality" and "nature" of these websites further demonstrate the defendants are not being subjected to the forum district's laws because of attenuated and isolated incidents. Accordingly, the exercise of personal jurisdiction over the Defendants BellSouth, SBC and U.S. West based on their continuous course of conduct in the District of Columbia comports with the demands of due process.

### B. The District of Columbia is a Proper Venue

Pursuant to 28 U.S.C. § 1391(c), venue is proper over a corporate defendant wherever it is subject to personal jurisdiction at the time the action is commenced. *See*

9. The court notes the existence of evidence tending to establish the two other section 13–423(a)(4) qualifiers, *i.e.*, regularly does or solicits business or derives substantial revenue from the district. The court makes no findings as to these qualifiers, however, because of the court's persistent course of conduct analysis.

*Heroes, Inc. v. Heroes Found.,* 958 F.Supp. 1, 5–6 (D.D.C.1996). For the reasons provided above, the court has personal jurisdiction over the five defendant RBOCs at the time the action was commenced. Accordingly, the District of Columbia is a proper venue.

## C. Antitrust Claims

Plaintiff GTE seeks relief under federal and District of Columbia antitrust laws for anti-competitive conduct arising out of the defendants' alleged monopolization of the Internet Yellow Pages market. In Counts I and II the plaintiff claims the defendants' alleged anti-competitive acts constitute a conspiracy to restrain trade and to monopolize the Internet Yellow Pages market in violation of §§ 1, 2 of the Sherman Act. GTE also seeks relief under the laws of the District of Columbia for unfair competition (Count III) and tortious interference with an existing contract (Count IV) and prospective business relationships (Count V). Pursuant to Fed. R.Civ.P. 12(b)(6) the defendants contest whether the plaintiff has stated a claim upon which relief can be granted in all of the above counts. Specifically, the defendants argue that the plaintiff (1) lacks proper standing under §§ 4, 16 of the Clayton Act to enforce antitrust violations pursuant to §§ 1, 2 of the Sherman Act, and (2) has failed to allege the required elements for relief under each count in the above counts.

 In analyzing a motion to dismiss, the court must accept the allegations in the complaint as true and construe them in light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The complaint must be liberally construed in the plaintiff's favor, giving deference to inferences derived from the factual allegations. *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). This admonishment takes on additional significance when there are alleged antitrust violations in which the proof is largely in the hands of the alleged conspirators. *Hospital Building Co. v. Trustees of the Rex Hosp.,* 425 U.S. 738, 744, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). A particular claim will be dismissed only if no set of facts can be proven that would entitle the plaintiff

to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Thus, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted with caution and very sparingly. *Id.* at 746–47, 96 S.Ct. 1848. With respect to antitrust violations, the plaintiff, however, must do more than cite relevant antitrust language to state a claim for relief. *TV Communications Network v. Turner Network Television,* 964 F.2d 1022 (10th Cir. 1992), *cert. denied,* 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992). Conclusory allegations that the defendant violated antitrust laws are insufficient. *Id.*

As explained more fully below, after applying the above standards to the complaint, the court concludes the plaintiff has proper standing under §§ 4, 16 to enforce alleged antitrust violations under §§ 1, 2 of the Sherman Act and has properly alleged claims in Counts I through III upon which relief can be granted. The court, however, declines to exercise supplemental jurisdiction over Counts IV and V and dismisses those counts. Therefore, the court denies in part and grants in part the defendants' motion to dismiss the complaint pursuant to FedR.Civ.P. 12(b)(6).

### 1. In Counts I and II Plaintiff Has Proper Standing to Sue for Violations of §§ 1, 2 of the Sherman Act

 Sections 4, 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, permit individuals to bring private enforcement actions under §§ 1, 2 of the Sherman Act against defendants for alleged antitrust violations. *See Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The plaintiff, however, must be of the class of persons who may seek relief under the antitrust laws. Under § 4, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue for treble damages. 15 U.S.C. § 15. Section 16 entitles "[a]ny person, firm, corporation, or association ... to sue for and have injunctive relief ... against *threatened* loss or damage by a violation of the antitrust laws." 15 U.S.C.

§ 26 (emphasis added). Despite the differences between "actual" and "threatened" injury the Supreme Court has held that determining standing under § 4 also determines standing under § 16. *Cargill v. Monfort of Colorado,* 479 U.S. 104, 111–13, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Therefore, a court must first determine if the plaintiff has properly established standing under § 4 of the Clayton Act, 15 U.S.C. § 15, before the court determines the sufficiency of the plaintiff's antitrust claims. *See Associated General,* 459 U.S. at 534–35, 103 S.Ct. 897. Under this standard, a showing of antitrust injury is a necessary element to establish standing under § 4 of the Clayton Act. *See Cargill,* 479 U.S. at 110, 107 S.Ct. 484. Along with antitrust injury a court should consider other factors (with no single factor being conclusive) to determine whether a plaintiff falls within the class of persons who have standing to sue under this section. These factors include (1) the causal connection between the antitrust violation and harm to the plaintiff and whether the violation was intended to cause harm to the plaintiff; (2) the nature of the injury and including the status of the plaintiff as a consumer or a competitor in the relevant market; (3) the directness of the injury and whether damages are too speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of other direct victims of the alleged antitrust violation. *See Associated General,* 459 U.S. at 535–45, 103 S.Ct. 897; *see also Re/Max Int'l v. Realty One, Inc.,* 900 F.Supp. 132, 147 (N.D.Ohio 1995).

### a. Plaintiff Has Properly Alleged Antitrust Injury

To allege antitrust injury, GTE must allege that its injury is of the type the antitrust laws were intended to prevent and necessarily flows from that which makes the defendants' acts unlawful. *Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The injury should reflect the anti-competitive effect either of the violation or of the anti-competitive acts made possible by the violation. *Id.* Additionally, because the antitrust laws were enacted for the protection of competition, and not competitors, it must also show an anti-

competitive impact on the market. *Id.* at 488, 97 S.Ct. 690. The reason an antitrust plaintiff is required to plead antitrust injury is to assure a plaintiff can recover only if the loss results from a competition-reducing aspect or effect of the defendants' behavior. *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Applying this standard, the court finds GTE has properly alleged antitrust injury.

The focus of GTE's antitrust claims center around the defendants' alleged unlawful conspiracy which excluded its SuperPages website service from competing against the defendants' website services. (Compl.¶¶ 42, 45.) Although the defendants' alleged conspiracy had several intertwined components, GTE claims the defendants' objective was to secure advertising revenue for their respective Internet Yellow Pages website services. (*Id.* ¶¶ 54–62). GTE supports this allegation by demonstrating the defendants engaged in exclusionary acts that were not only an integral part of the conspiracy, but also caused GTE to suffer the type of loss the defendants' anti-competitive conduct sought to achieve by bringing about the breakdown of competitive market conditions. In relevant part, GTE alleges that in order to accomplish this objective, the defendants devised a scheme to ensure the manner users accessed their website services. Consequently, GTE states the defendants also controlled how rival website services such as GTE's SuperPages could compete for users seeking such services. (*Id.*) GTE further substantiates allegations concerning the anti-competitive effect of the defendants' exclusionary acts by identifying its standing in competitive market conditions prior to the defendants' alleged conspiracy. (*Id.* 42, 45.) GTE's SuperPages and the defendants' competing websites both had similar direct hyperlinks and access on essential Internet access points such as Netscape's toolbar. (*Id.* ¶¶ 54–62.) Without continued opportunity to such links GTE contends the defendants effectively monopolized the Internet Yellow Pages market through anti-competitive exclusionary methods. Viewed in their entirety, the court finds GTE has demonstrated its injury is casually linked

and flows from the unlawful aspects of the competition reducing behavior. In this respect, the defendants' alleged anti-competitive conduct directly limited GTE's ability to generate advertising revenue for its Super-Pages. Accordingly, the court finds GTE has demonstrated antitrust injury for the purposes of §§. 4, 16 of the Clayton Act.

### b. Plaintiff Is Within the Class of Persons Who Have Standing to Sue for Antitrust Violations Based on Other Factors

As mentioned previously, in determining antitrust standing the court must consider several factors in addition to antitrust injury, such as the (1) nature of the claimed injury, (2) directness of the injury, (3) intent of the conspirators, (4) character of the damages, and (5) existence of more appropriate plaintiffs. See Associated General, 459 U.S. at 535–45, 103 S.Ct. 897; see also Re/Max, 900 F.Supp. at 147. Although no single factor is conclusive, viewed as a whole these factors further support the conclusion that GTE has standing to sue because its injury reflects the effects of the defendants' alleged anti-competitive conduct. As explained more fully below, the court finds GTE has sufficiently alleged the defendants' anti-competitive acts threaten the structure of the competitive conditions in the national Internet Yellow Pages market in which GTE belongs. First, to increase profits through their Internet Yellow Pages website services, the defendants allegedly sought to channel users away from competing services such as GTE's SuperPages. By allegedly conspiring to foreclose Internet access points to competitors and later allocating the Internet Yellow Pages market amongst each other, the defendants' acts directly caused the type of injury to GTE that it intended—limiting GTE's ability to generate advertising revenue by maintaining a high user base. Second, the direct injury GTE allegedly suffered is also not far removed in the chain of causation to the defendants' acts. See Associated General, 459 U.S. at 540–41, 103 S.Ct. 897. The defendants' exclusionary acts directly injured their competitors in the Internet Yellow Pages market, including the plaintiff's SuperPages, by disrupting the primary means for GTE to

generate income from its website. These allegations sufficiently demonstrate GTE's injuries are not merely indirect or remote, but properly attributable to the defendants' acts to make the plaintiff among those persons to enforce the antitrust laws in these circumstances. Accordingly, in view of the above factors the court concludes GTE has standing to sue under §§ 4, 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

### 2. In Count I Plaintiff Has Sufficiently Alleged a Violation of § 1 of the Sherman Act

 To plead sufficiently a § 1 violation of the Sherman Act, a plaintiff must allege (1) the existence of a contract, combination, or conspiracy which constitutes (2) an "unreasonable" restraint of trade having (3) an impact on interstate commerce. See 15 U.S.C. § 1; see also Standard Oil of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). For the reasons set forth below, the court finds that the plaintiff has sufficiently alleged a conspiracy to restrain trade in violation of § 1 of the Sherman Act in Count I of the complaint.

 To satisfy the first prong under § 1, the plaintiff must demonstrate that the challenged restraint is not the result of independent actions by the defendants. See Monsanto v. Spray–Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). That is, the plaintiff must set forth factual allegations showing the defendants consciously committed to a common agreement of an unreasonable restraint on trade. Id. at 752, 104 S.Ct. 1464. Here, GTE has provided sufficient allegations that demonstrate the defendants consciously committed to a common scheme designed to achieve an unlawful objective. Specifically, GTE alleges the defendants entered into a conspiracy based on a number of meetings in Colorado, Michigan, Georgia, and California to accomplish a common goal of controlling and dominating the Internet Yellow Pages to increase advertising revenue for their website services. (Compl.¶¶ 54–62.) In those meetings the defendants allegedly agreed to allocate exclusively specific regions of the United

States (as manifested by their MAP) for their respective website services. (*Id.*) The complaint states the defendants' concerted activity furthered this scheme by channeling users to their MAP and away from competing services. (*Id.* ¶ 62.) Examples of the defendants' concerted acts include agreements with Netscape and Yahoo! to provide exclusive hyperlinks to the defendants' MAP by eliminating hyperlinks to all non-defendant competitor websites on Netscape's toolbar and Netscape's Guide by Yahoo!'s toolbar.

 Under the second prong, to show the defendants alleged conspiracy has an unreasonable restraint of trade the plaintiff must demonstrate that the challenged restraint has an anti-competitive effect on competition. *See Atlantic Richfield,* 495 U.S. at 344, 110 S.Ct. 1884. To determine whether the defendants' acts are anti-competitive, courts use two standards to judge the challenged restraint's impact on competition: the "rule of reason" and the *"per se"* rule. *See Ass'n of Retail Travel Agents, Ltd. v. Air Transport Ass'n of America,* 623 F.Supp. 893, 898–99 (D.D.C.1985). The "rule of reason" inquiry focuses on the challenged restraints' impact on competition by determining whether the restraint imposed merely regulates and perhaps promotes competition or whether it suppresses or even destroys competition. *See Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Because the "rule of reason" weighs competitive factors to determine if there has been a sufficient interference or an impact on competition, courts focus on the challenged restraints (1) market power and (2) the effect it will have on the competition in that market. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). The *"per se"* standard, however, does not require similar inquiries, but presumes the conduct will have an unreasonable effect on competition. *Northern Pacific R.R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). In this regard, a restraint is "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm [it has] caused or the business excuse or [its] use." *Id.*

 Typically courts have discerned two major types of antitrust conspiracies to restrain trade. "[R]estraints imposed by ... competitors have traditionally been denominated as horizontal restraints, and those imposed by ... firms at different levels of distribution as vertical restraints." *Business Electronics Corp. v. Sharp Electronic Corp.,* 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Certain horizontal agreements to divide markets or allocate customers are considered so inherently anti-competitive they are condemned as per se illegal. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The majority of agreements, however, are assessed under the "rule of reason" because the economic effect of most alleged anti-competitive conduct is not immediately obvious and the risks of associated with prematurely condemning pro-competitive activity. *See Continental,* 433 U.S. at 58–59, 97 S.Ct. 2549 (stating departure from the "rule-of-reason" standard must be based upon demonstrable economic effect rather than upon formalistic line drawing).

Here, the plaintiff argues the court should not use the prevailing "rule of reason" standard to assess the defendants' conduct because it does not have any pro-competitive justifications and is within an area where application of the per se rule is firmly established. Rather, the plaintiff states the challenged restraint is per se illegal and therefore presumed to have an unreasonable restraint on competition because the conduct is a horizontal conspiracy involving agreements among competitors at the same level of competition to restrain trade. Specifically, the plaintiff states that as competitors in the Internet Yellow Pages market the defendants (1) agreed to allocate territories and customers among themselves, (2) refused to compete against each other in their designated regional market, and (3) entered into exclusive dealing arrangements with Internet service providers to deny competing website services from having links to key

Internet access points. (Compl.¶¶ 77–81.) Although the plaintiff seeks per se scrutiny the court must still analyze the nature of the agreement in order to determine whether such an assessment is proper. For the reasons stated below the court agrees with the plaintiff.

Understanding that conspiracies may have many facets and purposes, the court concludes that sufficient allegations exist in Count I to characterize the challenged restraint as a horizontal agreement subject to the per se rule. GTE has adequately demonstrated that the essence of the defendants' conspiracy was a scheme by horizontal competitors to maximize their profits in the Internet Yellow Pages market by insulating themselves from competition. (*Id.* ¶¶ 63–72.) Simply put, the challenged restraint involves competitors at the same level of distribution agreeing to allocate geographic territories and customers. *See Business Electronics Corp. v. Sharp Electronics,* 485 U.S. at 729, 108 S.Ct. 1515; *see also United States v. Topco Associates,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (stating a classic example of a § 1 *per se* violation is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition). To this end the defendants engaged in a series of intertwined related acts revolving around the horizontal market allocation aspect of the alleged conspiracy. The fact that the alleged anti-competitive acts possessed vertical aspects does not change the ultimate goal of the market allocation agreement by horizontal competitors in the Internet Yellow Pages market. These alleged concerted activities between competitors did not seek to enhance competition in the Internet Yellow Pages market, but rather to create a scheme of increasing the profitability of the defendants' websites by erecting anti-competitive barriers for actual and potential competitors. Moreover, because the horizontal agreement is not ancillary to any efficiency-enhancing economic activity it is properly characterized as a product of competitors at the same market level seeking to restrain trade and therefore subject to per se treatment.

Finally, the plaintiff has sufficiently demonstrated the last essential element to establish a § 1 claim. This last prong focuses on whether or not the challenged restraint has the requisite impact upon interstate commerce. The complaint clearly states the defendants' conspiracy prevents actual and potential competitors from entering the Internet Yellow Pages market, which in turn disrupts how users across the nation access those services. (Compl.¶¶ 73–76.) Accordingly, GTE has sufficiently pleaded a § 1 violation of the Sherman Act in Count I.

### 3. In Count II Plaintiff Has Sufficiently Alleged a Violation of § 2 of the Sherman Act

GTE claims the defendants' concerted acts violate § 2 of the Sherman Act, which makes it an offense for any person to "combine or conspire ... to monopolize any part of trade or commerce among the several States...." 15 U.S.C. § 2. To allege sufficiently a § 2 conspiracy violation, a plaintiff must allege (1) the existence of a combination or conspiracy to monopolize, (2) overt acts done in furtherance of the combination or conspiracy, (3) an effect upon an appreciable amount of interstate commerce, and (4) specific intent to monopolize a designated segment of commerce. *Genetic Systems Corp. v. Abbott Laboratories,* 691 F.Supp. 407, 420 (D.D.C.1988). For the reasons stated below, the plaintiff has sufficiently alleged a conspiracy to monopolize the national Internet Yellow Pages market in Count II of the complaint.

In this case, GTE satisfies the first three prongs. Specifically, GTE alleges the defendants formed a conspiracy based on a number of meetings in Colorado, Michigan, Georgia, and California, in order to control, capture, and dominate the national Internet Yellow Pages market. (Compl.¶ 47–60.) As stated previously, the defendants allegedly furthered their conspiracy by forming agreements with Netscape and Yahoo! to obtain exclusive links for their MAP on Netscape and Netscape's Guide by Yahoo!. GTE alleges these exclusive agreements affect interstate commerce because competing providers of national Internet Yellow Pages

services are prevented from obtaining hyperlinks on essential Internet access points disrupting the manner in which nationwide users access those services. (*Id.* ¶ 71.)

■■■ GTE also satisfies the last prong of the § 2 violation of the Sherman Act. In determining whether the plaintiff satisfies the specific intent to monopolize element, a court can infer intent from conduct that has no legitimate business justification but to destroy or damage competition. *Association for Intercollegiate Athletics for Women v. NCAA,* 735 F.2d 577, 585 (D.C.Cir.1984). For these claims, no particular level of "market power" or "dangerous probability of success" has to be alleged or proved here because a conspiracy to monopolize claim under § 2 is different from the crime that is the object from the conspiracy. *See American Tobacco Co. v. United States,* 328 U.S. 781, 789, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). The specific intent to monopolize can be demonstrated if it is otherwise apparent from the character of the defendants' actions. *See Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 926 (9th Cir.1980). Here the defendants' alleged acts clearly demonstrate the defendants possessed the specific intent to monopolize the Internet Yellow Pages market. The defendants' alleged anticompetitive conduct effectively eliminated a viable means of competing in the Internet Yellow Pages market for actual and potential competitors. (Compl.¶ 76.) By channeling users away from competing services, such as GTE's SuperPages, the defendants not only restricted competitors from generating advertising revenue but also secured profitability for their website services. In this context it is apparent that the purpose behind these concerted acts was to "drive . . . rival[s] from the market by exclusionary or predatory means." *See Intercollegiate Athletics for Women,* 735 F.2d at 585. Accordingly, the court finds GTE has sufficiently pleaded a § 2 violation of the Sherman Act in Count II.

#### 4. In Count III Plaintiff Has Sufficiently Alleged District of Columbia Law Unfair Competition Claims

■■■ The plaintiff seeks relief under D.C.Code § 28–4502, which prohibits "[e]v-

ery contract, combination . . . or conspiracy in restraint of trade . . . within the District of Columbia," and § 28–4503, which makes it unlawful for "any person to monopolize, attempt to monopolize, or combine or conspire with any other persons or persons to monopolize any part of trade . . . within the District of Columbia." (*See* Compl. ¶ 4.) Because these provisions essentially track the language of §§ 1, 2 of the Sherman Act, respectively, much of the analysis for federal antitrust claims will provide much force in the context of these provisions. *See Mazanderan v. Independent Taxi Owners' Assoc., Inc.,* 700 F.Supp. 588, 591 n. 9 (D.D.C.1988) ("Analysis of plaintiff's state antitrust claim necessarily follows that of the federal claim . . . ."). The only difference between the two statutes is that the D.C.Code does not require an interstate nexus, but rather a connection within this jurisdiction. Here, the plaintiff has satisfied this separate requirement by alleging the defendants' anti-competitive activity impacts upon Internet users and businesses purchasing Internet Yellow Pages advertisements in the District of Columbia. (*See* Compl. ¶¶ 5–6.) Accordingly, the court concludes GTE has sufficiently alleged a unfair competition claim arising from violations under D.C.Code §§ 28–4502, 28–4503.

#### E. The Court Exercises Supplemental Jurisdiction Under 28 U.S.C. § 1367(a) over Count III Only

Finally the defendants requests that the court dismiss the plaintiff's common law claims for tortious interference with existing contract (Count IV) and prospective business relationships (Count V) for failure to state a proper claim upon which relief can be granted. Alternatively, the defendants seek to have the court decline asserting supplemental jurisdiction over the common law claims in Count III through V because the plaintiff has failed to plead adequate facts to support its federal antitrust claims. Without addressing the merits of the defendant's challenge to the sufficiency of those counts, for the reasons to follow the court will only assert supplemental jurisdiction over Count

III and will dismiss without prejudice Counts IV and V of the Complaint.

██ The court can exercise supplemental jurisdiction over plaintiff's additional District of Columbia and common law claims against the defendants if the claims "are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The decision to exercise supplemental jurisdiction is within the sound discretion of the court and is guided by factors enumerated in 28 U.S.C. § 1367(c). *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C.Cir.); *Holland v. O'Bryant*, 964 F.Supp. 4, 7 (D.D.C.1997). Under § 1367(c), the court may decline to exercise supplement jurisdiction under § 1367(a) if (1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(a).

██ Using the factors enumerated under § 1367(c), the court concludes there are no compelling reasons to decline exercising supplemental jurisdiction over the plaintiff's unfair competition claim (Count III). As set forth previously, the court has already upheld the sufficiency of both the plaintiff's federal and District of Columbia antitrust claims. Moreover, because the plaintiff's unfair competition claim involves acts that directly relate to the defendants' alleged conspiracy, in violation of the federal antitrust laws, and arise from the same "common nucleus of operative facts," it is in the interest of judicial economy to adjudicate all such related claims. 28 U.S.C. § 1367(c). Therefore, the defendants' motion for the court to decline exercising supplemental jurisdiction over Count III is denied.

Using these same factors in determining whether to exercise supplemental jurisdiction over the plaintiff's tortious interference claims, however, leads the court to decline exercising supplemental jurisdiction over Counts IV and V. At present the essential elements to state a claim for a tortious interference with contract are unsettled in the District of Columbia and therefore implicate specific bases under § 1367(c) for declining to exercise supplemental jurisdiction over this claim. *See Edmondson & Gallagher v. Alban Towers Tenants Association*, 48 F.3d 1260, 1266 (D.C.Cir.1995); *see also Minebea Co. v. Papst*, 1998 WL 344342, 13 F.Supp.2d 35, 41 (D.D.C. June 22, 1998) (declining to exercise supplemental jurisdiction over same claims). Moreover, because the claims for tortious interference with existing contract (Counts IV) and prospective business relationships (Count V) require proof of the same elements, *see Bell v. Ivory*, 966 F.Supp. 23, 31 (D.D.C.1997), the court declines to exercise supplemental jurisdiction over either claim. Accordingly, the court concludes that exercising supplemental jurisdiction over Counts IV and V would not serve the principles and interests underlying the doctrine of supplemental jurisdiction and therefore dismisses those claims without prejudice.

A separate Order of Entry of Judgment accompanies this Memorandum Opinion.

### ORDER

For the reasons set forth in the attached memorandum opinion for the above-captioned case, it is this 28th day of September, 1998

**ORDERED** that Motion of BellSouth Defendants to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Improper Venue be and is hereby **DENIED;** it is

**FURTHER ORDERED** that Motion of SBC Defendants to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Improper Venue be and is hereby **DENIED;** it is

**ORDERED** that Motion of U.S. West, Inc. and of U.S. West Media Group, Inc. to Dismiss Complaint of Plaintiff GTE New Media, Inc. be is and hereby **DENIED;** it is

**FURTHER ORDERED** that Motion of Netscape Communications Corporation to Dismiss the Complaint for Failure to State a

Claim for Relief be and is hereby **DENIED** as moot; it is

**ORDERED** that Defendants' Motion to Dismiss Complaint of Plaintiff GTE New Media, Inc. be and is hereby **GRANTED** in part and **DENIED** in part; it is

**FURTHER ORDERED** that Motion of Plaintiff GTE New Media's Emergency Motion for an Expedited Rule 16 Scheduling Order be and is hereby **DENIED;** it is

**ORDERED** that Motion of Bell Atlantic's Corporation and Bell Atlantic Electronic Commerce Services, Inc. to File Materials Under Seal be and is hereby **GRANTED;**

**FURTHER ORDERED** that Motion of Netscape–Yahoo! to File Unredacted Version of the Contract Under Seal be and is hereby **GRANTED;**

**ORDERED** that Moving Defendants' Motion for a Prompt Ruling on the Pending Motion to Dismiss for Failure to State a Claim be and is hereby **DENIED** as moot; it is

**FURTHER ORDERED** that Motion by Defendants for Oral Argument be and is hereby **DENIED;** it is

**ORDERED** that Yahoo!, Inc.'s Motion for *Pro Hac Vice* Admission of Joel Linzner, Esquire, be and is hereby **GRANTED;** it is

**FURTHER ORDERED** that a Status Hearing for the Above–Captioned Case is Set for October 30, 1998, at 9:00 A.M.; and it is

**ORDERED** that the parties submit a Joint 206 Report and Trial Certification by October 16, 1998.

**SO ORDERED.**